**UNITED STATES, Appellee,**

v.

**Marvin A. CLARK, Staff Sergeant U.S. Army, Appellant.**

No. 66,189.
CM 8901701.

U.S. Court of Military Appeals.

Argued Feb. 11, 1992.

Decided Sept. 14, 1992.

For Appellant: *Dan R. Hyatt* (argued); *Captain Robert H. Pope* (on brief); *Captain Timothy P. Riley, Captain Pamela J. Dominisse, Captain Jay S. Eiche.*

For Appellee: *Captain Glenn L. Kirschner* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Captain Timothy W. Lucas* (on brief); *Captain Randy V. Cargill.*

*Opinion of the Court*

WISS, Judge:

A general court-martial consisting of officer members convened in Wuerzburg, Germany, and convicted appellant, contrary to his pleas, of 2 specifications of committing indecent acts on a child under the age of 16 years, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The court members sentenced appellant to a dishonorable discharge, confinement for 14 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed in an unpublished opinion dated January 14, 1991.

On appellant's petition, we granted review of the following four issues of law:

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING APPELLANT'S REQUEST FOR CONTINUANCE AND FOR PRODUCTION OF WITNESSES.

II

WHETHER APPELLANT'S CONSTITUTIONAL RIGHT TO CONFRONT AND CROSS–EXAMINE WITNESSES AGAINST HIM WAS DENIED BY ADMISSION OF HEARSAY EVIDENCE ABSENT A SHOWING OF UNAVAILABILITY OF THE DECLARANT.

III

WHETHER APPELLANT'S CONSTITUTIONAL RIGHT TO CONFRONT AND CROSS–EXAMINE WITNESSES AGAINST HIM WAS DENIED BY ADMISSION OF HEARSAY WHICH LACKED ADEQUATE INDICIA OF RELIABILITY.

IV

WHETHER THE UNITED STATES ARMY COURT OF MILITARY REVIEW ABUSED ITS DISCRETION IN DENYING APPELLANT'S REQUEST FOR NEW TRIAL WHERE APPELLANT'S NEWLY DISCOVERED EVIDENCE WAS WITHHELD FROM APPELLANT BY THE GOVERNMENT.

Now, after fully considering these issues, we hold that none has merit. Before more fully discussing them, however, some factual background is necessary to put them in context. The Government's evidence (*see United States v. Seger*, 25 MJ 420, 421 (CMA 1988)) reflects the following circumstances that are relevant to the granted issues.

The alleged victims in this case are appellant's stepdaughter, Nikki, who was 5 years old at the time, and a 13–year–old neighbor named Cindy, who babysat Nikki and her 7–year–old brother named Bran-

don, for appellant and his wife while they worked. Both of the incidents that underlie the charges occurred on July 24, 1988, after appellant had returned home from driving his wife to work.

Cindy was babysitting the children in appellant's house. When appellant entered the house, Cindy was watching television. He "came up to me ... gave me a hug and he touched me [on my breast] and kissed me on my cheek." Cindy became upset and pushed him away; appellant stopped but admonished Cindy "not to tell" anyone.

Shortly thereafter, appellant left the house with Nikki, saying that he was going to see if he could buy some toys. About 2 hours later, they returned; appellant left Nikki with Cindy and departed. Cindy and the children visited appellant's wife at work, and then they went to a playground. Sometime while they were there, Cindy asked Nikki if her "dad ever done anything to you that he was not supposed to." Nikki responded negatively, but Cindy asked her again. This time, Nikki said she did not want to talk about it in front of other children and asked if they could talk privately.

After Cindy and Nikki had walked away from the other children, Nikki revealed "that her dad had taken her to the corn field ... [and] when they got there that her dad asked her to take off her clothes and he took off his shorts and ... he put Brandon's thing in her thing." By "Brandon's thing," Cindy understood Nikki to mean "his privates." Nikki also told Cindy "that her dad had put some cream on her." Nikki was "crying the whole time" and asked Cindy, "Please don't tell, because I don't want my dad to get mad at me." Cindy, who also began crying, promptly told the story to a friend's mother, who took Nikki to the local Army hospital.

At the hospital, Nikki was seen by Dr. (Captain) Seaworth, who is a medical doctor, certified in family practice, and who was the emergency room doctor on call that day. Dr. Seaworth testified at trial during an Article 39(a)* session to litigate

appellant's motion *in limine* to exclude the doctor's testimony as to what Nikki had told him.

Dr. Seaworth saw Nikki as an "alleged sexual abuse" victim. He introduced himself to Nikki as a doctor, and he asked her what happened. Dr. Seaworth explained that his opening question "is pretty much a routine part of a history physical that you would do on an alleged sexual abuse victim, you want to find out what exactly had happened so that you have an idea what you need to examine, where you need to examine and how best to treat the patient involved."

During trial (appellant's motion having been denied), Dr. Seaworth related that, in response to his question, Nikki had told him

that her father was going to take her to get some toys, ... that he took her to a corn field. Once they got to the corn field she said her daddy took her clothes off her and then he took his shirt and his shorts off himself and that he touched her on her bottom, she indicated her genital area; she said that her daddy then put some cream stuff on her bottom and then put the thing between his legs in her bottom.

Nikki also told him that her father had done this before and he "believe[d]" that, by the "thing between his legs," Nikki had meant appellant's penis.

At the outset of Dr. Seaworth's interview of Nikki, the child was noticeably upset. "Initially she was crying and seemingly scared; she initially avoided eye contact and looked down, seemed to kind of curl up. We tried to get her to relax and once she started talking she had good eye contact and she did seem to settle down; she stopped crying and told her story." During this interview, Cindy also "comforted" Nikki and "told her it was all right for [Nikki] to talk to [Dr. Seaworth] because [he] was a doctor." Additionally, Nikki's mother, who also had arrived at the hospital, calmed Nikki "and told her that it was all right for [Dr. Seaworth] to examine

* Uniform Code of Military Justice, 10 USC § 839(a).

her." After the interview, Dr. Seaworth physically examined Nikki, the details of which he revealed at trial but are not particularly pertinent to this appeal.

In addition to the testimony of Cindy and Dr. Seaworth, the prosecution introduced other evidence, including testimony from one of appellant's neighbors who provided additional information that tended to support the evidence just summarized. For instance, when the neighbor had visited appellant's home the evening after the incident, he had noticed a jar of Vaseline from which "a large scoop had been taken and there was also a wood chip inside the Vaseline," as well as some dust and dirt. This compared with Dr. Seaworth's earlier testimony "that there were specs of either dirt or sand in the groin region" of Nikki when he had examined her.

Additionally, the neighbor testified that, on July 30, in an effort to try to locate this cornfield that Nikki had talked about, he had driven Nikki, Brandon, and their mother "to a place where Sergeant Clark and I had once been" a few months earlier. The neighbor testified:

> [W]e pulled in, and it's a blacktop, tractor path type of road and it doglegs to the left. And Debbie [Nikki's mother] asked Nikki if she [had] seen anything she recognized, and as we pulled into the dogleg and came around the dogleg Nikki was looking around and then she pointed out a group of trees and said, "I've been behind those trees with daddy."

The neighbor described the area in question as "an open area, mostly the fields, the cornfields." After driving away, Nikki recognized certain landmarks on the way back home and gave accurate directions to her house.

After Dr. Seaworth had examined Nikki at the hospital the day of the incident, the child was taken to Wuerzburg to be interviewed by agents of the Criminal Investigation Command (CID). There, however, she became emotional and was unable to talk about the events. Thereafter, Nikki's mother refused to permit CID agents to interview her daughter over the next 2 weeks or to allow anyone else to talk to Nikki about the incident. She repeatedly expressed her disbelief of the allegations.

After about 2 weeks, Nikki's mother approached appellant's commander and asked if she could return to the United States without appellant. The commander advised her that it would take from 2 weeks to 2 months to get approval for her request, and she became visibly upset. Within a few days, she left Germany with Nikki in tow, telling no one of her intentions or where she could be located.

### Issues I and II

#### A

As is apparent from the first two granted issues set out earlier, neither Nikki nor her mother testified at appellant's court-martial, either personally or through recorded testimony. Instead, Nikki's out-of-court statements to Cindy and Dr. Seaworth were admitted into evidence through those witnesses. The circumstances surrounding this state of the record were brought out during two Article 39(a) sessions on May 17, 1989, prior to impaneling the court members.

At the first hearing, which began at 10:25 a.m., defense counsel entered several evidentiary objections via motions *in limine*, one of which was to Cindy's anticipated testimony as to what Nikki had told her the day of the incident. As part of the litigation of this particular motion, Cindy testified to the events surrounding Nikki's statements. When Cindy's testimony had ended, defense counsel moved for production of the CID agent who had interviewed Cindy that day; the agent then was assigned in the United States. The military judge denied that motion, indicating he saw no material reason for the agent's testimony, and implicitly indicating that he would permit Cindy's testimony about Nikki's statements to her.

The second hearing began at 11:43 a.m., on the heels of the first. It soon became clear that the purpose of this session was to hear defense counsel's motion for a con-

tinuance in order to obtain the testimony of Nikki and, related thereto, for counsel to indicate that he wished to withdraw from his stipulation with trial counsel that Nikki was unavailable.

At this hearing, which was approximately 10 months after the incident and about 5 months after charges had been referred against appellant, civilian defense counsel acknowledged that appellant's wife had taken her children and returned to the United States sometime shortly after the incidents. It was also revealed that appellant himself had known for a good while prior to this hearing where his wife and Nikki were, but appellant had not revealed their whereabouts because his wife refused to return to Germany. Even after defense counsel had told appellant "that I wanted to have them over here as witnesses" and that, if they would not return, "I wanted to have them deposed back in the United States," appellant had kept their location to himself.

However, the night before the hearing, appellant had telephoned counsel and told him that "now she wants to come over here." The next morning—the morning of the hearing—defense counsel had advised appellant that the presence of his wife, alone, was "insufficient" and that Nikki was required, too, either personally or in the form of deposition in the United States. "And I indicated to him that it was his choice as to whether or not he wanted them over here, and he indicated to me that he now wants to do whatever is necessary to have the testimony of Nikki and the testimony of his wife before the trier of fact."

At that point, appellant stated on the record the telephone number of his wife's neighbor in Bloomington, Illinois (his wife did not have a home telephone), and her work telephone number. On this basis, defense counsel indicated that he now wished to withdraw from the stipulation of unavailability of Nikki to which he earlier had agreed with trial counsel; further, he asked for a continuance to permit either a videotaped deposition of Nikki or her personal appearance at trial.

Trial counsel objected to the defense's "11th hour request." She noted in the form of an offer of proof the rather significant efforts that the Government had made to try to ascertain the location of Nikki and her mother, to no avail. Indeed, trial counsel was not even sure exactly when the witnesses had left Germany ("sometime between 12 and 17 August") "because when asked, Sergeant Clark refused to disclose the date that his family left country." In essence, trial counsel argued that it was appellant's own doing that had made Nikki and her mother unavailable until that very morning and that, accordingly, further delay was inappropriate.

Ultimately, the military judge ruled as follows:

That request is denied. My determination here is that the unavailability of the witness at this time could have been prevented by the requesting party; the accused cannot come in at this late date and frustrate these proceedings by now giving the address of his wife and daughter, if indeed that is the address of his wife and daughter; of course all we have at this point is the telephone number of a neighbor, and even if we were to make efforts to contact that witness at this time there's no assurance that one, we would be able to contact the witness; and two, that either of those two individuals would cooperate ·in these proceedings, either there or here. I'm also not satisfied that the testimony of the mother would in any way be material to these proceedings.

Additionally, the military judge attached to the record a "Memorandum of Decision" respecting this and other related motions. In that memorandum, the military judge entered several relevant specific findings of fact that are reasonably supported by the evidence of record and defense counsel's offer of proof:

(1) Mrs. Clark and her daughter, Nikki, are unavailable as witnesses at this proceeding, and their unavailability is the fault of the accused;

(2) Even if the accused's cooperation during the pendency of these court-martial charges would not have been successful in procuring the personal attendance of either of these witnesses at this trial, his cooperation—as opposed to his past refusal to cooperate and his past statements that served to frustrate efforts to locate these witnesses—could have insured that an adequate substitute for face-to-face confrontation, such as a videotaped deposition, could have been obtained, or could have facilitated the venue of this trial being changed;

(3) The accused['s] statement that he felt that his wife would now be willing to appear, and might appear, as a witness in his behalf, is an ill-fated effort on the accused's part to frustrate the court-martial proceedings or to delay the proceedings to his own advantage, especially in light of:

(a) Its lack of timeliness, coming as it did for the first time immediately after the rather convincing testimony of Cindy [pursuant to an earlier defense motion *in limine* to keep out Cindy's testimony concerning what Nikki had told her] on the motion;

(b) The lack of any prior notice to opposing counsel, and apparently even his own counsel;....

In its review the Court of Military Review expressed similar factual findings:

We find as a matter of fact that the mother refused to let the victim talk to social workers, medical personnel and criminal investigation personnel. Shortly after the incident, the mother returned to the United States without leaving an address or telephone number. The accused knew the location of the victim and the victim's mother but refused to disclose it until the day of trial.

Unpub. op. at 1.

### B

■ We will assume in this appeal, as the military judge seemed to indicate at one point in his dialogue with the parties during the litigation of this issue, that the departure of appellant's wife and children from Germany was not attributable to him—that is, we will assume that his wife decided for herself and could not have been persuaded otherwise by appellant to take her children and return to the United States.

Even so, the military judge specifically found as fact, supported by the record, that appellant knew where they could be located in the United States and deliberately chose to keep that information to himself for several months, right up to the morning of trial. Additionally, the military judge's conclusion that appellant's motivation for doing so was to gain calculated tactical advantage is supported by defense counsel's indication that, all along, he advised his client that Nikki's testimony was important; that it could be obtained either through her return to Germany or through taking a deposition in the United States; and that, ultimately, "it was his choice." Yet, the defense waited until *after* hearing Cindy's testimony the previous hour to unwrap appellant's newly found cooperativeness in locating his daughter.

■ We recognize that appellant's wife and Nikki could not be returned to Germany against their will to testify at appellant's court-martial. *United States v. Bennett*, 12 MJ 463 (CMA 1982). *Cf. United States v. Burns*, 27 MJ 92 (CMA 1988) (Arts. 46 and 47, UCMJ, 10 USC §§ 846 and 847, respectively, together provide means for obtaining presence of witnesses in United States at a court-martial in the United States). We also recognize, though, that they *could* have been compelled to testify by deposition in the United States. *See United States v. Bennett, supra* at 467. It was due only to appellant's own affirmative refusal to cooperate with the effort to locate his family—lack of cooperation that, as the military judge found, extended even to secrecy from his own defense counsel—that made it impossible to secure their testimony in some form right up to the moment of trial.

Under these circumstances, the military judge did not abuse his discretion in de-

clining to grant the requested continuance. *See* RCM 703(c)(2)(C), Manual for Courts–Martial, United States, 1984. Trial counsel's offer of proof at trial, supplemented by her affidavit in the Court of Military Review, details the steadfast but unsuccessful efforts by the Government to locate appellant's family. We conclude that, here, the Government "exert[ed] all reasonable measures to acquire the presence of the witnesses ..." *United States v. Hines*, 23 MJ 125, 133 (CMA 1986). Appellant's last-gasp change of heart concerning his earlier conscious lack of cooperation does not require that the wheels of this already-rather-slow-moving train come to yet another defense-inspired, grinding halt. *See* RCM 703(b)(3).

■ Moreover, appellant's own misconduct in concealing their location constructively waived any evidentiary or constitutional right to object to the military judge's subsequent ruling that Nikki was "unavailable." *See United States v. Hines, supra* at 131. *See also United States v. Thevis*, 665 F.2d 616, 627 (5th Cir.), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). "As in *Hines*, the 'unavailable' witness was at all times available to appellant for examination as to her out-of-court statements.... We did not permit such gamesmanship in *Hines* [of using "the confrontation shield as a sword"], and we will not do so here." *United States v. Hughes*, 28 MJ 391, 395 (CMA 1989).

Issue III

In the third granted issue, appellant asserts that the testimony of Dr. Seaworth and Cindy about Nikki's statements to them lacked adequate indicia of reliability, which rendered admission of that testimony a denial of constitutional confrontation and cross-examination rights. We do not agree.

Appellant principally relies upon *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), which, until this most recent term, was the Supreme Court's latest consideration of the relationship between the hearsay rule and its several exceptions, and the Constitution's Confrontation Clause. There, the Court recalled that "[t]he Confrontation Clause ... bars admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright*, 497 U.S. at 814, 110 S.Ct. at 3146. The Court reminded practitioners of the " 'general approach' " to be found in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), "for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause," as follows:

"First ... [i]n the usual case ..., the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Second, "once a witness is shown to be unavailable, ... his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.* In other cases, the evidence must be excluded, at least absent *a showing of particularized guarantees of trustworthiness."*

497 U.S at 814–15, 110 S.Ct. at 3146, quoting *Ohio v. Roberts, supra* at 65–66, 100 S.Ct. at 2538–2539 (citations omitted; emphasis added; footnote omitted). *See Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987); *Lee v. Illinois*, 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986).

In this just-completed term, the Supreme Court again addressed the relationship between hearsay-rule exceptions and the Confrontation Clause. In *White v. Illinois*, — U.S. —, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Court made clear that, at least as to *some* of the "firmly rooted" exceptions—such as statements of a co-conspirator (*see United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)), spontaneous exclamations, and statements for purposes of medical treat-

ment—it is unnecessary to demonstrate the declarant's unavailability at trial in order to satisfy the Confrontation Clause. At ——, 112 S.Ct. at 739.

■ The complained-of testimony of Dr. Seaworth was admitted by the military judge under the "firmly rooted" medical-treatment exception. Thus, if properly admitted under that exception, *see infra*, Nikki's unavailability is irrelevant to this appeal as to that testimony. Cindy's testimony about Nikki's out-of-court statements, however, was admitted under the residual-hearsay exception, which is not one of the "firmly rooted" exceptions. *See Idaho v. Wright*, 497 U.S. at 817, 110 S.Ct. at 3147; *United States v. Hines, supra* at 134. It is not at all certain under *White v. Illinois* and *Idaho v. Wright*, both *supra*, that the declarant's unavailability is irrelevant, under that exception, to satisfying the Confrontation Clause, even if the reliability concerns surrounding the residual exception are met.

In any event, we have resolved the matter of Nikki's unavailability by concluding that appellant waived his complaint in that regard through his own misconduct in contributing to her unavailability. *See United States v. Thevis, supra.* Accordingly, we now turn to the second criterion for admissibility—" 'indicia of reliability.' " *See Idaho v. Wright* and *Ohio v. Roberts*, both *supra.*

### A

■ As to Dr. Seaworth's testimony about Nikki's statements, the military judge admitted the evidence under one of the "firmly rooted hearsay exception[s]"— statements for purposes of medical diagnosis or treatment. *See Idaho v. Wright, supra* at 817, 820, 110 S.Ct. at 3147, 3149, Mil.R.Evid. 803(4), Manual, *supra.* Thus, if Nikki's statements to Dr. Seaworth come within this exception to the hearsay rule, that satisfies the Confrontation Clause's concern about reliability.

The medical-treatment exception is "based on the belief that persons making such statements are highly unlikely to lie."

*Idaho v. Wright, supra* at 820, 110 S.Ct. at 3149. Thus, "unless it appears that the child knows at least that the person is rendering care and needs the information in order to help, the rationale for the exception disappears entirely." *United States v. Avila*, 27 MJ 62, 66 (CMA 1988), *affirmed after remand*, 29 MJ 299, *cert. denied*, 493 U.S. 1002, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989). In other words, in deciding whether particular statements are embraced by the medical-treatment exception, "we look to the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *United States v. White*, 25 MJ 50, 51 (CMA 1987).

In explaining his ruling that Nikki's statements to Dr. Seaworth were admissible under Mil.R.Evid. 803(4), the military judge acknowledged Nikki's initial lack of cooperation during her visit with the doctor in the hospital emergency room and that she had to be coaxed into responding to the doctor's questions. Dr. Seaworth testified that Nikki was scared at first—that she cried, avoided eye contact, looked down, and curled her body up.

Ultimately, though, Nikki calmed down and talked willingly, without crying and with good eye contact. Her cooperation was obtained by the assurance to her of Cindy—a person she obviously trusted— that "it was all right for her to talk to [Dr. Seaworth] because [he] was a doctor," as well as Nikki's mother's comfort "that it was all right for [Dr. Seaworth] to examine her."

There is every indication in the record that Nikki knew who she was seeing and why and that, once calmed down, she expected from Dr. Seaworth what 5-year-olds typically expect of doctors who are seeing them for a particular problem: help with that problem. On the other hand, there is no indication in the record that her responses to Dr. Seaworth's questions were prompted by any other motivation.

*See United States v. White, supra.* As the military judge concluded:

> Given the circumstances and location of the examination, Nikki had to know, as best as a five-year-old child could have known, that she was being treated by a medical doctor in a rather large hospital and was going to be physically examined, as opposed to just being interviewed about the alleged offense or counselled by a social worker or psychologist.

■ We hold, therefore, that Nikki's statements to Dr. Seaworth were for the purpose of obtaining medical treatment, *see United States v. Edens,* 31 MJ 267, 269 (CMA 1990); *United States v. Avila* and *United States v. White,* both *supra.* Thus, coming within a "firmly rooted exception[ ]" to the hearsay rule, Nikki's statements to Dr. Seaworth were sufficiently reliable to permit their admission through Dr. Seaworth's testimony without violating the Confrontation Clause. *See White v. Illinois, supra.*

### B

■ Nikki's statements to Cindy, in contrast, were not admitted under one of the "firmly rooted" exceptions. Instead, in permitting this evidence, the military judge relied upon Mil.R.Evid. 804(b)(5), the so-called residual exception. *See United States v. Hines, supra* at 134.

"Hearsay statements admitted under the residual exception, almost by definition, . . . do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." *Idaho v. Wright,* 497 U.S. at 817, 110 S.Ct. at 3148. Thus, even if statements meet the three components for admissibility under Mil.R.Evid. 804(b)(5)—a matter that appellant does not contest in this Court—we still must consider whether there was "a showing of particularized guarantees of trustworthiness" surrounding the making of the statements so as to satisfy ourselves that admission of the statements did not violate the Confrontation Clause. *Id.* at 818, 110 S.Ct. at 3148.

In looking for these "particularized guarantees of trustworthiness," we examine "the totality of the circumstances." The only "relevant circumstances," however, are "those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 819, 110 S.Ct. at 3148.

In ruling that Nikki's statements to Cindy were admissible, the military judge relied, *inter alia,* upon these factual findings:

> (c) [The statements] were voluntary, uncontrived, unconstrained, and spontaneous in that none of the essential details of these statements were suggested to [Nikki] by others . . .;

> \* \* \*

> (h) No motive was suggested for [Nikki] to lie;
> (i) Nikki had first hand knowledge of all the events to which her out-of-court statements pertained;
> (j) Nikki's information and knowledge, with regard to the offense [relating to her abuse] . . . is not within the realm of a common knowledge for a normal five-year-old child, and there is no evidence that that knowledge could have been acquired by Nikki in any other way other than as a victim of a sexual assault by the accused in the time, place, and manner alleged;

We are persuaded by these findings of fact, reasonably supported in the record, that the circumstances surrounding Nikki's statements to Cindy reflect the "particularized guarantees of trustworthiness" that satisfy the Confrontation Clause where the witness is not available. Nikki's statements were to her babysitter, in whose care she had been entrusted by her mother on a daily basis for several months (*cf. United States v. Williamson,* 26 MJ 115, 116 (CMA 1988)); she was still suffering under the trauma of the event when she made her statements (*cf. id.;* Mil.R.Evid. 803(2)); although Cindy had asked her the question more than once, the question did not suggest in the slightest the nature of the answer that Nikki gave or its details;

the substance of that answer is not within the ken of the average 5–year–old child; and there is no basis in the record upon which to suppose a motive for Nikki to lie—or, considering the substance of her statements, any basis upon which she *could* make such statements if they were not reliable. *See generally Idaho v. Wright, supra* at 821–23, 110 S.Ct. at 3149–50.

Thus, we are convinced by these "particularized guarantees of trustworthiness" surrounding the making of Nikki's statements to Cindy that the statements are sufficiently reliable so as not to violate appellant's confrontation rights, where Nikki was not available as a live witness at trial.

### Issue IV

In the Court of Military Review, appellant filed several defense appellate exhibits as a means of demonstrating newly discovered evidence that, he urged, should cause that court to grant his petition for new trial. *See* Art. 73, UCMJ, 10 USC § 873. The Court of Military Review denied the petition, finding that "[t]here appears to be little question that this evidence could have been discovered by appellant with due diligence" and that, in any event, "this evidence, in view of all the other pertinent evidence, would not have produced a substantially more favorable result for appellant." Unpub. op. at 2. *See* RCM 1210(f)(2). In this Court, appellant urges that the court below abused its discretion in denying his petition. *See United States v. Bacon,* 12 MJ 489 (CMA 1982). We do not agree.

Because we conclude that the evidence now offered up by appellant is "such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence," RCM 1210(f)(2)(B), it is unnecessary for us to consider whether the evidence might have produced a different result. Thus, we need not detail the purported newly discovered evidence on which

appellant relies. Suffice to say that all of it was available, prior to trial, from appellant's wife. As noted earlier in this opinion, there is every indication that appellant was in contact with his wife through the substantial part of her nearly–1–year hiding. It is true that the record suggests that appellant kept his family's location a secret from his own counsel, as well. But appellant cannot withhold an important card, even from his own counsel, and then hope to play it as trump on appeal if and when he loses at his trial.

Accordingly, the Court of Military Review did not abuse its discretion in denying appellant's petition for new trial on the basis of this evidence.

### Decision

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (concurring):

I agree with the majority opinion and write only to observe that the analysis utilized by the majority in *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) [cited in Part III of the majority opinion, 35 MJ at 104], seems to apply only to statements being measured for compliance with the Confrontation Clause when the witness is unavailable to testify. In cases such as the *instant* one, where there is no confrontation issue because of waiver, I do not believe the constitutional restrictions regarding use of corroborating evidence apply. 497 U.S. at 822, 110 S.Ct. at 3150. Thus, unless some other prohibition arises, I believe that corroborating evidence can be used to assess the "equivalent circumstantial guarantees of trustworthiness" prong of the residual hearsay evidentiary rules. Mil.R.Evid. 803(24) and 804(b)(5), Manual for Courts–Martial, United States, 1984. I do not read the majority opinion as implying the contrary.