UNITED STATES, Appellee

v.

Jose M.C.R. URETA, Master Sergeant
U.S. Air Force, Appellant.

No. 95–0321.
Crim. App. No. 30274.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 7, 1995.

Decided Aug. 29, 1996.

Certiorari Denied Jan. 6, 1997.

See 117 S.Ct. 692.

For Appellant: *David R. Dowell* (argued); *Colonel Jay L. Cohen* and *Captain Marge A. Overly* (on brief).

For Appellee: *Captain R. Scott Howard* (argued); *Colonel Jeffery T. Infelise* (on brief); *Colonel Thomas E. Schlegel.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members at Rhein–Main Air Base, Germany, convicted appellant, contrary to his pleas, of rape, carnal knowledge, and committing an indecent act upon a female under the age of 16, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. The approved sentence provided for a bad-conduct discharge, confinement for 10 years, and reduction to the lowest enlisted grade. The Court of Criminal Appeals set aside the conviction of carnal knowledge, reassessed the sentence, and affirmed only so much of the sentence as provided for a bad-conduct discharge, confinement for 7 years, and reduction to the lowest enlisted grade. 41 MJ 571, 581 (1994).

We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S PREJUDICE BY ADMITTING THE VIDEOTAPED INTERVIEW OF [K] TAKEN BY SPECIAL AGENT DAVID DICK.

II (Modified)

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTAN-

TIAL PREJUDICE BY ADMITTING THE TESTIMONY OF DR. STEPHEN BOOS.

## III

WHETHER IT WAS IMPROPER TO ALLOW THE PROSECUTOR TO CALL A WITNESS SOLELY TO IMPEACH HIM/HER.

## IV

WHETHER IT WAS IMPROPER TO ALLOW EXTRINSIC EVIDENCE OF TESTIMONY OF MRS. CHRISTINA M. URETA AT THE ARTICLE 32(b) INVESTIGATION UNDER THE GUISE OF IMPEACHING MRS. URETA.

We resolve all four issues against appellant.

### Factual Background

JH, a friend and schoolmate of appellant's 13–year–old daughter, K, testified that on the afternoon of March 17, 1992, K told her that appellant "had been messing with her" since she was 9. JH testified that K did not want to go home and that she wanted the "messing" to stop. JH asked K "if she wanted to talk to" JH's mother, Mrs. H, and K accepted.

On the morning of March 18, Special Agent (SA) David Dick of the Air Force Office of Special Investigations (OSI) interviewed K for about 30 minutes. Based on K's complaint that her father was sexually molesting her, the OSI agents took K, accompanied by Mrs. H, to an Air Force Medical Center in Wiesbaden, Germany. At the medical center a pediatrician, Major (Maj) Stephen Boos, MD, examined K. Maj Boos had been notified that "a suspected child sexual abuse" case was being brought to the emergency room. When K arrived, the OSI agents told Maj Boos what K had told them: that K "had been sexually abused but that sexual abuse had involved intercourse but not anal penetration or oral sex."

Maj Boos asked K whether she wanted Mrs. H present, and K responded in the affirmative. Maj Boos "told them who I was,

Dr. Boos, that I was a pediatrician, let them know that I had heard a little bit of [K's] story and that I wanted to talk to her and to examine her to see whether any harm had come to her, whether she had caught any infections; but that before I started, to do the best job I needed to hear her story from herself."

Maj Boos explained his purpose as follows:

Well, we always screen for sexually transmitted diseases and pregnancy, but our index of suspicion is changed by the events as they occurred. I'm also trying to evaluate to a certain degree whether I feel the patient is telling a credible statement, whether they have the details and experiences, relate the experiences that I would expect from this kind of patient so that I can know whether it's a likely statement or an unlikely statement. And I want to know what kind of psychological state they're in, whether they've been in a lot of involvement with a person who's very close to them over a long period of time, which is likely to be more difficult for them, or whether it was a simple single involvement with someone who they're not really too close to, which is less psychologically traumatic. And I try to make some of these determinations to discuss with the other members of the team.

Maj Boos was asked, "What is the overall purpose of this?" He responded, "It's to provide medical treatment, including psychological treatment."

Maj Boos testified that he was aware of "the medical exception to the hearsay rule" and that when there is a possibility of having to testify, he tries "to get as much of what the person that you're treating says" into the medical records. Maj Boos testified further, however, that most of what he wrote in his notes "is necessary knowledge for her therapist, for treating her."

Maj Boos testified that he examined K and found "some vaginal changes that were consistent with having been penetrated" and symptoms of a potential sexually-transmitted disease. Asked about his plan of treatment, Maj Boos testified:

I screened her for sexually transmitted diseases and pregnancy. I recommended that she see a gynecologist. I recommended that visit be delayed until after she had had her tests back so that if there were other things to be treated it could be done in one visit and spare her the additional visit but when all the tests were negative I wished her to be seen by a gynecologist where he could verify and evaluate further that papule in her vagina. I felt that she needed to be engaged early in a plan of treatment, psychological treatment, for her what I felt was a full sexual abuse accommodation syndrome at the hands of her father who is a very close person to her and therefore has a greater potential for doing psychological harm and having long-term impact. I recommended that to her counselor and then I recommended that she be placed in foster care because I didn't think the home was a good place for her to return to at that point.

The defense objected to Maj Boos' testimony on the ground that his questioning of K was for criminal investigative purposes rather than medical diagnosis and treatment. *See* Mil.R.Evid. 803(4), Manual for Courts-Martial, United States (1995 ed.). The military judge overruled the objection. Before the members, Maj Boos testified that K told him that appellant had begun touching her when she was 9 years old. Maj Boos asked K, "Normal people touch each other and normal fathers touch normal girls; was it like that?" K responded, "No, it wasn't, because he had touched her breasts and her butt." Maj Boos testified further:

I asked her if she had told anyone, and she said that she hadn't told anyone. And then later on I asked her when it had changed, since I'd already heard some other stories, and she said, around 10 or 11 it had changed. I said, what was different? And I can't quote her but she said she had begun having sexual intercourse. At first she couldn't recall that word and she looked to Mrs. [H], but before Mrs. [H] could answer she recalled the words, "sexual intercourse." And then, because that's a school word, a word adults use in talking with children sometimes, I asked her, you

know, if her dad had taken his penis out, and she said, yes. And I asked her if he had touched her with it, and she said, yes. I said, "Where?" And she said, "Inside my butt." And then I asked her if she could explain "inside my butt" a little bit more, and she couldn't explain it any further than that.

Maj Boos testified that K told him that sexual intercourse with appellant had begun when she was between 10 and 11 years old. He asked her when the last time was, and K told him it was "the Sunday before." Maj Boos testified further:

She said her father had come back from Africa and that at night when she was in bed he had come into her room and come to her bed and put his hands in her pants and begun messing with her, in her words, and then they did it. I said, "Did what?" and she said they had sex. And then I asked her some questions about, did anything come out of his penis? And she said, yes, sperm. Again, sperm was kind of a schoolbook word and so I asked her how did she know about sperm? She said that she learned about sperm in school. Then I asked her if anything came out of her and she said, "Sperm," so I said, "What was it like?" And she made kind of a distasteful face and said it was gross and slimy.

Maj Boos testified that his physical examination revealed that K had a "papule" or "bump" in her vagina, which he thought might be a papilloma, which is a sexually transmitted virus infection. He noted a notch in her hymen, "a finding that's not found in normal 13-year-old girls." He said that the significance of the notching is "a subsequent penetration of some sort."

After Maj Boos' medical examination was completed, the OSI transported K and Mrs. H back to the OSI office, where they conducted a videotaped interview of K. SA Dick testified that it was "standard" in sexual abuse cases to videotape the interview. He explained why:

Well, for one, the videotape can be shown to prosecution and defense attorneys so that the victim is not, in essence, questioned over and over; and for another,

because in child sexual abuse allegations it seems that the children always recant statements prior to trial.

K's "best friend" (JH) and JH's mother were present during the videotaped interview at K's request. During the interview, K said that appellant "has been ... messing with me ever since I was 9." K told SA Dick that appellant "touches my breasts and private parts." She said the touching happened 4–5 times a week. She told SA Dick that appellant began having "sexual intercourse" with her when she was 11. She said that appellant "tried to put his private into my mouth," but she pushed him away. She said that the last instance of fondling and sexual intercourse was 2 days before the interview.

After the videotaped interview with the OSI, K returned to the pediatric ward in Wiesbaden. She was interviewed there by Captain Carl Rohbock, a Family Advocacy Officer and Mental Health Officer.

Capt Rohbock was not called as a prosecution witness, but was requested by the court members after both sides had rested. A defense objection that Capt Rohbock's testimony did not qualify under Mil.R.Evid. 803(4) was overruled. Admissibility of Capt Rohbock's testimony is not before this Court.

Capt Rohbock had three visits with K in the hospital and six more in the Mental Health Clinic. He testified that on March 18, 1992, at his first meeting with her, K told him "that her father had started at the age of 9 ... manipulating her vaginal area with his fingers, sleeping with her, rubbing her, touching her; and that by age 11 that had progressed to full intercourse where he was penetrating and having intercourse with her." At their third meeting in the hospital, K repeated her allegations. In spite of her allegations against her father, K told Capt Rohbock that she preferred to live with her father instead of her mother. Capt Rohbock explained that K "had made some allegations of physical abuse by the mother toward the two boys; that her mother was very controlling, demanding; and that she didn't like her mother. Specifically, she hated her mother."

During subsequent meetings, K was very angry and "upset" with her mother "[b]e-cause her mother knew that she was being sexually abused and was not acting to protect her." On May 19, 1992, Capt Rohbock noted that K "began to be noncooperative .... [n]ot wanting to talk; not wanting to come to meetings; not wanting to participate in therapy or sessions with her mother...." Capt Rohbock testified that K told him that she had talked with her aunt, who told her "[t]hat if she would change her story that her father would be able to get treatment; that sexual abuse would no longer be continuing; that [K] could come and live with her; and that her father could get treatment and wouldn't have to go to prison." K told Capt Rohbock that her aunt's suggestion was "repulsive."

On March 23, 1992, appellant's wife, Christina Ureta, made a sworn statement to SA Dick. Mrs. Ureta is K's mother. Mrs. Ureta told SA Dick that on March 18, after the OSI agents had left their home, appellant admitted sexually abusing K. In her statement, Mrs. Ureta also said that appellant admitted placing his fingers in K's vagina but denied having sexual intercourse with K. (Prosecution Exhibit 2 for Identification)

On June 15, a lawyer representing K informed military authorities that K would invoke her privilege under German law and refuse to testify regarding the charges against her father. Attached to the lawyer's letter was a statement from K recanting her accusations against appellant. (Defense Exhibit A) At trial, counsel for both sides agreed that K could not be compelled to testify and was therefore unavailable.

Mrs. Ureta testified at the investigation under Article 32, UCMJ, 10 USC § 832, on June 16, 1992. She repeated what she told SA Dick—that appellant admitted placing his fingers in K's vagina. (Pros. Ex. 3 at 3) She testified that this admission was on March 18, the day K was interviewed by the OSI and Maj Boos. She also testified that on April 4, she confronted appellant with K's accusations and appellant admitted having sexual intercourse with K. (Pros. Ex. 3 at 4) Finally, she testified that appellant tried "[a]t least four times" to persuade her to change her testimony. (Pros. Ex. 3 at 17)

At trial the military judge overruled defense motions in limine and admitted the OSI interview videotape. (Pros. Ex. 1) The military judge made findings to support his ruling admitting the videotape, as follows:

The videotape interview has ample guarantees of trustworthiness. The declarant's statement was obtained without leading questions and is in her own words. It is the freely conceived product of the declarant as opposed to the result of suggestive interrogation. The statement is voluntary, is under oath, is detailed, is factual as opposed to conjectural, and is based on first-hand knowledge of the events. The declarant was relatively mature and aware of the need to be truthful; she lacked a motive to falsify at the time, she was a member of the accused's household and depended upon him for support, and she subjected herself to ridicule and social stigma among her friends and family by making the statement. The statement was made by the declarant shortly after the incident to which the statement relates with little opportunity to reflect, and is similar to other "firmly rooted hearsay exceptions," i.e., it is a restatement of allegations made earlier that same day to Dr. Boos in a very reliable setting that qualifies under MRE 803(4), and is also a restatement of allegations made the day before to [JH] in a reliable setting that nearly qualifies under MRE 803(2).

Mrs. Ureta was called by the prosecution on the merits but was something of a "wild card" witness. During the initial Article 39(a), UCMJ, 10 USC § 839(a), session, trial counsel informed the military judge, "I don't know what, if any, testimony she will provide." Later, when the military judge asked trial counsel if Mrs. Ureta would be testifying, trial counsel responded:

Sir, she is here; but whether or not she's actually going to testify and give us any information, I don't know. Like I said, when I realized she was here I asked her if she was going to testify and she said, "I won't answer you. I haven't decided yet."

When Mrs. Ureta was called as a prosecution witness, she declared, "I do not wish to answer any questions and testify against my husband." The military judge informed her that she "must answer or suffer any consequences for refusing to testify." She was then asked: "[W]hat admissions did your husband make to you concerning any child sexual abuse he might have done against your daughter?" She denied that appellant made any admissions to her. She testified that she lied to SA Dick because appellant gave her "a hard time" after she had an affair in 1991, and she saw her interview with SA Dick as an opportunity to "repay what he did to me."

The military judge sustained a hearsay objection when trial counsel attempted to introduce Mrs. Ureta's statement to the OSI, but he told trial counsel "you can ask the witness if certain parts of this are true." Trial counsel then questioned Mrs. Ureta about the statement line-by-line. With no defense objection, trial counsel read each sentence, and asked her if she said it and whether it was true. She responded each time that the statement read was not true. The written statement was not received in evidence.

Trial counsel then questioned Mrs. Ureta about her Article 32 investigation testimony. Again, trial counsel read the questions and answers and asked Mrs. Ureta if that was her testimony. She consistently responded that her responses were lies. Again, defense counsel did not object.

Trial counsel offered the transcript of Mrs. Ureta's Article 32 testimony. Defense counsel did not object to trial counsel's examination of Mrs. Ureta about her Article 32 testimony but objected to admission of the Article 32 transcript. The military judge opined that the Article 32 testimony of Mrs. Ureta was admissible as substantive evidence under Mil.R.Evid. 801. He asked defense counsel if he disagreed, and defense counsel responded: "As much as I would like to, I believe that you have accurately stated the current status of the law."

## Discussion

In its review of the legal and factual sufficiency of the evidence, the court below noted: "Convictions based solely on hearsay are troubling, even if the military judge committed no errors in admitting the hearsay." 41 MJ at 580. The dissenting opinion of the court below recites: "Appellant was convicted of child sexual abuse solely on the basis of out of court statements of sexual abuse made by his 13 year old daughter." 41 MJ at 581. Neither of these statements is entirely accurate.

Regarding the former, appellant was not convicted "based solely on hearsay." The Article 32 testimony of Mrs. Ureta was admitted as substantive evidence under Mil. R.Evid. 801(d)(1). This Rule provides that a prior statement by a witness is *not* hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]"

Regarding the latter, appellant was not convicted solely on the basis of K's out-of-court statements. K's statements were supported by appellant's admissions of guilt to his wife (Pros.Ex. 3) and Maj Boos' physical examination.

Appellant has not challenged the legal sufficiency of the evidence before our Court but has challenged admissibility of the evidence against him. We will discuss each of his challenges seriatim.

### Videotaped OSI Interview (Issue I)

Defense counsel conceded that K was unavailable as a witness. The military judge admitted the videotape under Mil.R.Evid. 804(b)(5) as "residual hearsay." Appellant contends that the military judge erred in concluding that the statement met the requirement for "circumstantial guarantees of trustworthiness." The Government argues that the military judge's findings of fact are supported by the evidence and support his conclusion that the videotape meets the requirements of Mil.R.Evid. 804(b)(5).

Both Mil.R.Evid. 803(24) and 804(b)(5) relate to "residual hearsay." We generally have analyzed the "circumstantial guarantees of trustworthiness" the same way under both rules. As we noted in *United States v. Lyons,* 36 MJ 183, 186 n. 2 (CMA 1992), "The only difference [between the two Rules] is that, unlike the former, the latter applies only when the declarant of the prior statement is not available."

In *United States v. McGrath,* 39 MJ 158, 164–67 (1994), however, we identified a fundamental difference between the two rules. Where the declarant actually testifies, the military judge may look beyond the circumstances of the declaration and consider corroborating evidence to determine if the declaration is sufficiently trustworthy to be admitted. Where the declarant does not testify, however, the military judge may consider only those circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *United States v. Pollard,* 38 MJ 41, 49 (CMA 1993), quoting *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990).

Examples of circumstances that may be considered, when the declarant is unavailable, include spontaneity, consistent repetition, mental state of the declarant, and lack of motive to fabricate. 497 U.S. at 821–22, 110 S.Ct. at 3149–50. In addition, use of open-ended, non-leading questions; repeated emphasis on truthfulness; and declarations against the declarant's interest (*e.g.,* not being able to go back home) tend to support trustworthiness of the declaration. *United States v. Pollard,* 38 MJ at 50; *United States v. Lyons,* 36 MJ at 186. Statements elicited by law enforcement officials are regarded with caution but are not *per se* inadmissible. *United States v. Pollard,* 38 MJ at 49; *United States v. Giambra,* 33 MJ 331, 334 (CMA 1991).

Even if it meets the reliability test, however, evidence may not be admitted as "residual hearsay" unless it is "necessary" to prove the case and "more probative on the point for which it is offered than any other evidence which the proponent can procure through

reasonable efforts." Mil.R.Evid. 803(24). *See United States v. Giambra,* 33 MJ at 334 (residual hearsay must be "necessary").

■ The military judge's decision to admit "residual hearsay is entitled to 'considerable discretion' on appellate review." *United States v. Pollard,* 38 MJ at 49. We hold that the military judge did not abuse his discretion by admitting the OSI interview videotape.

Even though K was interviewed at the OSI offices, the "police station" atmosphere was attenuated by the presence of her best friend (JH) and JH's mother, in whom K had first confided. The military judge was satisfied, as are we after viewing the videotape, that the questions were not suggestive. The interview was 2 days after that last incident of abuse. The military judge noted, as did the military judge in *Pollard,* that the victim was making herself homeless by accusing her father.

■ Appellant argues that the military judge erred by considering extrinsic corroboration—the previous statements to JH and Maj Boos—in assessing the reliability of the videotape. We disagree. The military judge properly considered K's statements immediately before the OSI interview as indicia of "consistent repetition." *See* 38 MJ at 49. Given the compressed sequence of events, we conclude that K's consistent statements to JH and Maj Boos immediately before the OSI interview were part of "the circumstances surrounding the making of the statement." *Idaho v. Wright,* 497 U.S. at 820, 110 S.Ct. at 3149.

The requirement for "necessity" was met. K's out-of-court declarations were the only evidence, other than appellant's partial admissions, that appellant was responsible for the abnormal physical evidence noted by Maj Boos. Finally, K's videotaped interview was more probative than any other reasonably available evidence. It was the only evidence coming directly from K's mouth and not filtered through another declarant.

### Statements to Maj Boos (Issue II)

■ The military judge admitted K's statements to Maj Boos under Mil.R.Evid.

803(4), the so-called "medical exception" to the hearsay rule. The rule provides that out-of-court statements are not excluded if they are "made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

We stated in *United States v. Faciane,* 40 MJ 399, 403 (CMA 1994), that evidence

offered under Mil.R.Evid. 803(4) must satisfy a two-pronged test: "first the statements must be made for the purposes of 'medical diagnosis or treatment'"; and second, the patient must make the statement "with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought." A key factor in determining whether the second prong is met is "the state of mind or motive of the patient in giving the information ... and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed."

(Citations omitted.)

The military judge made the following findings of fact regarding K's statements to Maj Boos:

The declarant was 13 years old at the time, was of at least average intelligence, and fully understood that Dr. Boos' interview and physical examination of her was being done for purposes of medical diagnosis and treatment. She expected medical treatment and her statements were made in order to receive that treatment.

■ A military judge's finding that the declarant had "an actual expectation of receiving medical treatment" is a preliminary finding of fact. As such, it will not be overturned on appeal unless it is clearly erroneous. *United States v. Quigley,* 40 MJ 64, 66 (CMA 1994).

We hold that the military judge's finding is not clearly erroneous. There is ample evidence to support his finding that Maj Boos' interview was for medical diagnosis or treatment and that K provided information ex-

pecting treatment. K was old enough and intelligent enough to understand what was happening. Maj Boos identified himself as a pediatrician, questioned K in a hospital setting, performed a physical examination, conducted laboratory tests for pregnancy and sexually transmitted disease, and explained to K why he needed the information.

### Impeachment of Mrs. Ureta (Issue III)

■ Appellant argues that the military judge erred by permitting trial counsel to call Mrs. Ureta as a witness for the sole purpose of impeaching her. *See United States v. Pollard,* 38 MJ 41 (CMA 1993). The Government argues that *Pollard* is distinguishable because trial counsel did not know what, if anything, Mrs. Ureta would say. The Government points out that Mrs. Ureta's statement to the OSI was not admitted and that the military judge gave the members a proper limiting instruction. Answer to Final Brief at 21–22.

In *Pollard,* we held that the military judge abused his discretion by permitting trial counsel to call a "witness on the merits for the primary purpose of placing otherwise inadmissible evidence before" the members "under the guise of impeachment." 38 MJ at 50. Key to our analysis in *Pollard* was that "[t]rial counsel and the military judge knew beforehand that [the witness] would recant her pretrial statement in front of the court members, because she had done so in the hearing on admissibility of her pretrial statements." 38 MJ at 50–51.

In appellant's case trial counsel did not know if Mrs. Ureta would testify or, if she did, what she would say, because Mrs. Ureta refused to discuss the case with him. Based upon her OSI statement and her sworn testimony at the Article 32 hearing, trial counsel had reason to believe that she would provide evidence that appellant had admitted sexually abusing his daughter. Accordingly, we hold that the military judge did not err by permitting trial counsel to question Mrs. Ureta about her statement to SA Dick. Furthermore, assuming *arguendo* that the examination was error, it was forfeited by defense counsel's failure to object and does not rise

to the level of plain error. Mil.R.Evid. 103(a)(1) and (d); *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Finally, even assuming *arguendo* that any error in the examination of Mrs. Ureta was not forfeited, such error was harmless and did not materially prejudice appellant. Art. 59(a), UCMJ, 10 USC § 859(a). The same matters were covered in greater detail in the transcript of her Article 32 testimony, which was properly admitted as substantive evidence, as discussed *infra.*

### Admission of Article 32 Hearing Transcript (Issue IV)

■ Appellant argues that the military judge erred by admitting Mrs. Ureta's testimony at the Article 32 hearing. He argues that, if the declarant is available to testify—as she was—and admits to the inconsistency of the extrinsic evidence—which she did—then extrinsic evidence of the prior inconsistent statement is inadmissible. *See* Mil.R.Evid. 613(b). The Government argues that any error was forfeited because defense counsel conceded that the Article 32 testimony was admissible.

Mil.R.Evid. 613(b) provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

In *United States v. Gibson,* 39 MJ 319, 324 (CMA 1994), we reaffirmed our earlier interpretation of Mil.R.Evid. 613(b) in *United States v. Button,* 34 MJ 139 (CMA 1992): " '[E]xtrinsic evidence of a prior inconsistent statement should not be admitted for impeachment when (1) the declarant is available and testifies; (2) the declarant admits making the prior statement; and (3) the declarant acknowledges the specific inconsistencies between the prior statement and his or her in-court testimony.' " (Citations omitted.)

On the other hand, Mil.R.Evid. 801(d)(1) provides, "A statement is not hearsay if: ... The declarant testifies at the trial or hearing and is subject to cross-examination concern-

ing the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition...." Reading the two rules together, we hold that the Article 32 transcript could "not be admitted for impeachment" under Mil.R.Evid. 613(b) but was admissible as substantive evidence in its own right under Mil.R.Evid. 801(d)(1)(A). Under the circumstances, it was proper for trial counsel to use Mrs. Ureta to lay the foundation for admission of her Article 32 testimony and for the military judge to admit the transcript as substantive evidence. *See* S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual,* Editorial Comment at 761–62 (3d ed. 1991) (distinguishing between eliciting inconsistent statements that are admissible as substantive evidence and those that do not qualify under Mil.R.Evid. 801(d)(1)(A)).

■ The question remains whether the military judge erred by permitting the court members to take the Article 32 hearing transcript into their deliberations. In *United States v. Austin,* 35 MJ 271, 276 (CMA 1992), we examined RCM 921(b) and held that it was error to allow the court members to take a verbatim Article 32 transcript into deliberations. We noted that the error was "not *per se* reversible error" but must be tested for prejudice. 35 MJ at 277 n. 6.

Defense counsel did not object to the members' taking the transcript into deliberations. Since this case was tried before *Austin* was decided, we will not apply a forfeiture and plain-error analysis. We hold that the military judge erred by permitting the members to take the transcript of Mrs. Ureta's Article 32 hearing testimony into their deliberation room.

We hold further that the error was harmless. Unlike *Austin,* the transcript was not the only evidence against appellant. It was relevant only on the question whether appellant admitted his guilt to Mrs. Ureta. In addition to his admission of guilt, appellant was confronted with the videotaped statement of his daughter, the testimony of Maj Boos, and the testimony of Capt Rohbock.

Under the circumstances, we see no reasonable possibility that the finders of fact were influenced by the error. *See United States v. Barnes,* 8 MJ 115, 116 (CMA 1979).

## *Decision*

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

EVERETT, Senior Judge (dissenting):

I do not agree with the majority that the military judge did not err when he admitted into evidence Dr. Boos' testimony concerning statements made to him by the alleged victim [K], *see* Mil.R.Evid. 803(4), Manual for Courts–Martial, United States (1995 edition); neither do I agree with the majority that the military judge did not abuse his discretion when he admitted into evidence the videotape of an interview with K by an agent of the Office of Special Investigations (OSI), *see* Mil.R.Evid. 804(b)(5). Accordingly, in each instance, I agree with Chief Judge Dixon who dissented below, *see* 41 MJ 571, 581–87 (1994), that appellant was denied his constitutional confrontation right to cross-examine K, *see Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), and that the error was not harmless beyond a reasonable doubt, *see Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In *United States v. Clark,* 35 MJ 98, 105 (1992), this Court wrote that, when considering applicability of the medical-treatment exception to the exclusionary hearsay rule, *compare* Mil.R.Evid. 801 and 802 *with* Mil.R.Evid. 803(4),

> "we look to the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *United States v. White,* 25 MJ 50, 51 (CMA 1987).

Put another way:

> Thus, "unless it appears that the child knows at least that the person is rendering care and needs the information in order to

help, the rationale for the exception disappears entirely." *United States v. Avila*, 27 MJ 62, 66 (CMA 1988), *affirmed after remand*, 29 MJ 299, *cert. denied*, 493 U.S. 1002, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989).

*United States v. Clark, supra* at 105.

Despite the requirement that medical-treatment hearsay evidence meet this under-pinning of Mil.R.Evid. 803(4) if it is to be admitted under that exception, it does not appear that it was satisfied in this case. The OSI agent who conducted this investigation acknowledged that K did not ask to be taken to the hospital. Instead, she was taken there only after he had "asked her if she would consent to an examination *because medical evidence had to be gathered in these types of allegations.*" (Emphasis added.) Dr. Boos did testify that, when beginning his interview of K, he had told her that he "wanted to talk to her and to examine her to see whether any harm had come to her, whether she had caught any infections; but that before I started, to do the best job I needed to hear her story from herself."

As Chief Judge Dixon opined, this superficial record does not support a conclusion that K expected to receive medical help from Dr. Boos and that this help depended on her giving full and truthful information to the doctor. In fact, if anything, the record more likely suggests that K merely was asked to repeat to Dr. Boos the "story" she had told the OSI and that she anticipated a mere physical examination. At best from the Government's standpoint, the record is ambiguous, and ambiguity does not suffice for admissibility. Accordingly, in the absence of supporting evidence, I believe that the military judge was clearly erroneous in concluding that K had made her statements in the expectation of obtaining medical treatment.

As to the videotaped interview of K by the OSI, I am content to refer the reader to Chief Judge Dixon's treatment of that issue, 41 MJ at 584–86. For the reasons discussed by him, I believe that the Government has not carried its burden of "showing particularized guarantees of trustworthiness," *see Idaho v. Wright, supra* at 815, 110 S.Ct. at 3146—that is, circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 819, 110 S.Ct. at 3148; *accord United States v. Lyons*, 36 MJ 183, 186 (CMA 1992), and *United States v. Clark, supra* at 106.

Accordingly, I conclude that appellant has been denied his constitutionally assured right to confrontation as to the hearsay evidence from K, admitted through the testimony of Dr. Boos and the videotaped interview by the OSI. Further, there can be no sincere claim that this denial was harmless beyond a reasonable doubt. As a result, this conviction should be reversed; so I must dissent from the majority's decision to affirm it.

SULLIVAN, Judge (dissenting):

I join Senior Judge Everett's well-reasoned dissent—that is where justice is in this case.