UNITED STATES

v.

**Mark A. ROBERTS, Fire Controlman Second Class (E–5), U.S. Navy.**

**NMCM 99 01801.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 15 Jan. 1999.

Decided 14 Sept. 2001.

Greg D. McCormack, Civilian Defense Counsel.

LT Hardy Vieux, JAGC, USNR, Appellate Defense Counsel.

Maj Robert M. Fuhrer, USMC, Appellate Government Counsel.

Before LEO, Chief Judge, DORMAN, Senior Judge, and VILLEMEZ, Appellate Military Judge.

DORMAN, Senior Judge:

Contrary to his pleas, a general court-martial composed of officer and enlisted members convicted the appellant of raping a fellow Sailor. The appellant's crime violated Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920. The approved sentence includes confinement for 90 days and a bad-conduct discharge.

We have carefully reviewed the record of trial, the appellant's two assignments of error, the Government's Answer, and the appellant's Response to the Government Answer. In deciding this case we have also considered the excellent oral arguments presented by military appellate counsel at the Naval Justice School in Newport, Rhode Island, on 28 June 2001. Following our review of all these materials and the oral arguments, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

**Facts**

On 16 August 1997, Airman A, the "victim" in this case, arrived at the Bachelor Enlisted Quarters [BEQ] in Naples, Italy, and was assigned to a room on the second floor. She was there on temporary duty to receive dental work of a nature more complicated than she could receive on her ship. At the time she was also taking several medications to include, Percocet, Cleocin, and Motrin. The next afternoon, she attended a party near the BEQ, where she began to consume alcoholic beverages. She was at the party for several hours and then went to the club where she drank more alcoholic beverages. While at the club, she danced with several individuals. She recalls much of what went on there until after she drank some tequila.

Although the appellant was at the club on the evening of 17 August 1997, Airman A does not recall having met him that evening. In fact she testified that she did not meet the appellant until she saw him at the Article 32, UCMJ, investigation into the charge of which the appellant has now been convicted. Airman A does recall seeing him at the club on the evening of 17 August. Record at 391–92.

Shortly after Airman A drank some tequila, she was seen leaving the club with the appellant. Engineman Fireman Parke joined them and assisted in walking Airman A back to her BEQ room. Before leaving the club though, the appellant told Parke that he "had a chance with Airman [A]." Parke cautioned against it, because she was "too intoxicated." *Id.* at 333. Although Parke was not in the club all evening—he had gone in and out a few times—he noticed over the course of the evening that Airman A was losing her faculties. Her speech was getting slurred, she was stumbling, and, towards the end of the evening, she was "really, really, intoxicated." *Id.* at 332. *See also id.* at 402–03.

As the appellant and Parke escorted Airman A back to her BEQ room they had to hold her up so she would not fall, with Airman A positioned between the two of them. Airman A was walking very slowly. When they came to the BEQ, they basically carried her up the stairs. *Id.* at 336. When they arrived at her room she fumbled around for her keys. While she was doing that the door opened, and Airman A stated with surprise, "Oh, I have a roommate." *Id.* and at 400. In fact, Airman A had not met her roommate, Boatswain's Mate Third Class [BM3] Jennifer White, as she had checked in while Airman A was out of the room. *Id.* at 399–400. Parke and the appellant brought Airman A into the room and sat her on her bed. Parke then twice suggested to the appellant that they needed to go. *Id.* at 337, 400. Parke talked with White for about five minutes and then he left, telling the appellant that it was time to go. Parke then went to the television lounge area of the BEQ, just outside Airman A's BEQ room. White felt uncomfortable in the room, because it seemed like the appellant and Airman A were a couple. She, however, didn't think Airman A was physically capable of "do[ing]

anything."[1] *Id.* at 403, 412. She then went to the television lounge where she saw Parke and Fireman Ryan Thibodeaux, who expressed concern that the appellant was in the room alone with Airman A.[2] *Id.* at 339, 403. When White left her room, the lights were on in the room.

When Thibodeaux learned that the appellant was in the room with Airman A, he told Parke that they needed to get him out of there, and they went to the room. Upon knocking on the door, the appellant answered the door, and cracked it open enough for Thibodeaux to see the appellant's head and a bit of his shirt. The lights were turned off in the room. They told the appellant that he needed to get out of the room. The appellant acknowledged their concerns but then shut the door. Thibodeaux and Parke returned to the lounge, and Thibodeaux continued to watch the door to Airman A's BEQ room. When the appellant did not exit the room, Parke returned to the room, but there was no answer and the door would not open. *Id.* at 339, 454. Parke and Thibodeaux then sent White down to her room, and she opened the door with her key. The room was still dark inside. Although she could not see clearly what was going on in the room, she noticed that the appellant quickly got up from the bed, and when she asked if everything was okay, he said it was.[3] Between 15 and 30 minutes after White had initially left her room, the appellant came into the lounge, and asked White to be sure to wake Airman A by 0600. The appellant did not appear nervous when talking with White.

When she returned to her room, White observed Airman A lying in bed with just a shirt on and naked from the waist down. *Id.* at 411, 423. White found this surprising because she did not think that Airman A was capable of doing anything physical that evening. During her testimony, Airman A testified that she was never able to find the panties that she had been wearing that night. Furthermore, there is no evidence in the record suggesting that the appellant and Airman A had engaged in any sort of sexual or sensual activity prior to their being in the BEQ room together. In fact both White and Thibodeaux testified that they had seen no such contact between the appellant and Airman A. *Id.* at 436, 464.

Airman A testified that she began drinking on the afternoon of 17 August 1997, and continued drinking that evening at the club. She remembers very little about what happened to her after she drank the shot of tequila. She does not recall who walked her back to her BEQ room. *Id.* at 381. She testified that she recalled that upon returning to her room she mentioned to someone that she had a roommate. She also recalls trying to set her alarm clock, but that someone took it away from her. Her testimony continued:

> And after that I remember someone handing me a teddy bear that I had in my arms as I was laying down on my side. After that, I remember somebody asking me if they wanted—they asked me, would you like me to stay with you and I said, huh-uh. And they asked me, are you sure, and I said Uh-huh. And I'm not sure of the exact time limit, but the time—but later on I felt somebody roll me onto my back and I felt weight on top of me and I felt somebody kissing my neck, my chest and my face. And I remember putting my hands up trying to push them away and I remember trying to say no. I don't know if the words came out or not, but at this

---

1. BM3 White testified that Airman A was "barely standing" when the appellant and Parke brought her to the room. White testified further, "I have seen people intoxicated. She was drunk." Record at 402.

2. Fireman Parke, BM3 White, and Fireman Thibodeaux, all testified as to their understanding that it was rumored that the appellant had been involved in an earlier incident of a sexual nature with a female on board a ship, and that he had a "reputation for things like this." Record at 434. *See also id.* at 339, 452.

3. Actually BM3 White was not able to identify the appellant at trial. She, however, had identified the two individuals who had brought Airman A back to her room. One had glasses, and one was wearing a sling on his arm. The one wearing glasses (Parke) had already left the room by the time she went to check on Airman A. The person she saw move was wearing a sling, record at 400, 410, and the appellant was wearing a sling that evening.

time, I know I was pushing him away. I remember the weight off of me, and again, I'm not sure on the length of time, but I remember the weight on top of me again. And I felt someone pulling my shorts off and I remember putting my feet against them to try to push them away. I felt penetration and I remember the door opening and closing about two times——

*Id.* at 370. She further testified that she does not recall anything after she felt like she was being penetrated. Although she could not be "100 percent sure," she believed that a penis had penetrated her.[4] When she woke up the next morning she was nude from the waist down and her bra was up above her breasts. She also had soreness in her vagina, "like when somebody is trying to have sex with you and you are just, you are not ready." *Id.* at 387.

On Monday, August 18th, Airman A asked BM3 White what she recalled of the previous evening, but she did not say that she had been raped, nor did Airman A indicate that she was in any pain. She did tell White that she hoped the guy had used a condom, as she was concerned about getting pregnant and/or venereal disease. Airman A also told White that she recalled her peeking in and asking if everything was all right. Later that evening she met with Fireman Parke and told him that she thought she had been raped the night before. Parke reported what he knew the following day. Then, on Wednesday 20 August 1997, Senior Chief Thompson came to her and asked her if there was anything she needed to tell him, at which point Airman A told him about what happened the previous Sunday night. *Id.*

Several days later, BM3 White was dining at a cafeteria some distance from the BEQ. While there, the appellant came into the dining facility and got a tray of food. The appellant appeared startled at seeing White and left without eating. *Id.* at 412–15.

In addition to evidence relating to Airman A, the Government also introduced evidence of the appellant's earlier assault upon a female Sailor as she lay in her rack on board

the USS VELLA GULF on 16 February 1997. The admissibility of this evidence was litigated at trial, with the military judge issuing findings of fact relative to his ruling on admissibility. Appellate Exhibit XII.

Concerning the incident on board the USS VELLA GULF, the Government called three witnesses, Engineer Third Class [EN3] R, Operations Specialist Second Class [OS2] L, and Senior Chief Allen. With respect to their testimony the military judge instructed the members as follows:

> Evidence has been introduced that the accused may have indecently touched [EN3 R] without her consent in female birthing [sic] on board U.S.S. [sic] VELLA GULF in the early morning hours of 17 February 1997. If you find that he did so by a preponderance of the evidence, you may, but are not required to, consider that for any bearing it may have on the following matters: First, the motives of Robert Parke, Ryan Thibodeaux, and Jennifer White in checking on Airman [A] the night of the alleged rape. And second, whether the accused had any propensity towards committing the alleged rape.

Record at 601.

In brief, the evidence of the USS VELLA GULF incident consisted of the following. The "victim" of the indecent touching, EN3 R, testified that she had been sleeping in her rack in the female berthing compartment on board the ship in the early morning hours of 17 February 1997. A "privacy curtain" surrounded her rack. She was lying on her stomach and was awoken when she felt her blanket move and felt something run across her calf. In response she moved a little and she thought she saw someone walk out of her cubicle. She turned onto her back and was trying to fall back asleep when someone came back into her cubicle. Shortly thereafter her blanket moved again and a hand moved across her stomach and went down over the top of her shorts towards her vagina. When the hand started to go into her shorts, she ripped open the privacy curtain and she saw the appellant standing there.

---

4. An expert witness testified that sperm was found on the vaginal swab taken from Airman A, and that it could not have been more than 3 days

old. Record at 475–76. Airman A testified that she had not had sexual relations since February 1997. *Id.* at 388.

He jumped back and ran from the cubicle. EN3 R saw the appellant for about two seconds, but she knew him from serving on the ship together. She indicated that he was wearing a dark shirt and light pants that morning. She then got out of her rack and used the phone to report the incident to the quarterdeck. While using the phone, she noticed that another female member of the crew, Petty Officer L, was behind her.

Petty Officer L was also called as a witness. She testified that the night before the incident with EN3 R, the appellant had been running his hand through her hair at the enlisted club on base in Naples, Italy. She told him to stop and moved away from him. In her opinion the appellant was drunk at the time. Petty Officer L was also assigned berthing in the same cubicle as EN3 R. Her rack was right next to the rack of EN3 R. During the early morning hours of 16 February 1997, she saw a male wearing a dark shirt and light colored trousers leaving the women's berthing area. As soon as the man left, she saw EN3 R "scurry towards the starboard side of the ship." *Id.* at 301. At the time, EN3 R "seemed frightened, nervous, [and] upset." *Id.* Petty Officer L could not identify the man she had seen in women's berthing.

Finally, the Government presented the testimony of Senior Chief Allen, the Master at Arms who had immediately investigated the VELLA GULF incident. After getting information from EN3 R, he went and got the appellant out of his rack on board the ship. Although it was a little after 0500, the appellant immediately responded when Senior Chief Allen spoke the appellant's name. The appellant was taken to the Senior Chief's office and advised of his Article 31, UCMJ, 10 USC § 831, rights, which he waived. During the interview, the appellant seemed very nervous. Initially the appellant denied being in the women's berthing area at all. The appellant then said that he was there using the head, but when he realized he was in women's berthing, he left. Finally, the appellant stated that he did not recall being in women's berthing, but if he was, "he was pretty sure he didn't do the acts that he was being accused of." *Id.* at 310. The appellant also stated that he had been drinking that night.

Following the presentation of the Government's case-in-chief, the appellant called but one witness, a Navy doctor. He was recognized as an expert witness "in the field of alcohol abuse." *Id.* at 521. In general, he testified that based on the amount of alcohol that Airman A had consumed, given her weight, and the period of time over which she had consumed the alcohol that her BAC would have been about .06 around the time she returned to her BEQ room. He acknowledged that no blood alcohol tests were conducted on Airman A. He also indicated that the medications that Airman A was taking would have had no effect on her level of intoxication. The appellant did not testify on the merits of the case.

### Prior Acts of Sexual Misconduct

In his first assignment of error, the appellant asserts that the military judge erred by admitting evidence of the indecent assault upon EN3 R. He attacks the decision of the military judge on three bases. First, he asserts that the evidence should not have been admitted because the Government failed to prove that the appellant was intoxicated when he raped Airman A. Second, the appellant alleges that the balancing test employed by the military judge was inadequate. Third, he alleges that Military Rule of Evidence 413, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), is unconstitutional as violative of the due process clause of the Fifth Amendment to the Constitution under the facts of this case.[5]

In his first attack on the admissibility of the evidence, the appellant contends that because the Government failed to prove that he was drunk at the time Airman A was raped, the evidence of the indecent assault upon EN3 R should not have been admitted. He makes this argument because the military judge listed four conditions under which the appellant may have a propensity to commit a

---

5. We will not further discuss the constitutional issue raised by the appellant, because we find the issue resolved against the appellant's interests by *United States v. Wright,* 53 M.J. 476 (2000). *See also United States v. Bailey,* 55 M.J. 38, 40–41 (2001).

sexual assault upon a female. The first of those four conditions was when the appellant was "intoxicated from previous consumption of alcohol." Record at 90; Appellate Exhibit XII at 3. The appellant is correct in his assessment of the evidence, because the record does not support a conclusion that the appellant was intoxicated at the time Airman A was raped.[6] The appellant, however, is incorrect in his argument that this failure of proof rendered the evidence inadmissible.

The evidence of the appellant's indecent assault on EN3 R was offered under MIL.R.EVID. 413. That rule provides, in part, that where an accused is charged with a sexual assault, "evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." MIL.R.EVID. 413(a). The rule does not establish any particular preconditions for admissibility, other than that the accused is charged with a sexual assault, evidence that the accused committed a different sexual assault, and prior notice to the accused of the Government's intent to offer evidence of the other sexual assault. If those conditions are met, then the evidence "is admissible and may be considered for its bearing on any matter to which it is relevant." *Id.* Those conditions are met in this case.

With respect to the issue of the appellant's state of intoxication, we find minor fault with the rationale behind the ruling by the military judge. During the evidentiary hearing on the admissibility of the evidence the military judge had been presented with opinion evidence that the appellant was drunk on the evening of the assault upon EN3 R (Record at 37) and evidence that the appellant had been drinking on the evening that Airman A was raped. Appellate Exhibit X. Similar evidence was presented during the Government's case-in-chief. Record at 299, 449. Neither during the evidentiary hearing, nor the Government's case-in-chief was evidence presented that the appellant was intoxicated on the night that Airman A was raped. The

military judge, however, did not make a finding of fact that the appellant was intoxicated during either sexual assault. Rather than explaining his ruling as to why the evidence was relevant, he stated that the evidence could show the appellant's propensity to commit sexual assault against women under four conditions.

1. The accused is intoxicated from previous consumption of alcohol.

2. The targeted female victim is either asleep or heavily intoxicated from previous consumption of alcohol.

3. The accused gains access to private female quarters.

4. The accused is geographically separated from his family.

Appellate Exhibit XII at 3. While the record does not support the first "condition," there was no requirement that the military judge even put this explanation on the record. *United States v. Dewrell*, 55 M.J. 131, 138 (2001)(citing *United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir.1998)); *United States v. Wright*, 53 M.J. 476, 482 (2000).

The issue the military judge was addressing by his comments set out above was a threshold issue of relevance, not admissibility. *Wright*, 53 M.J at 482. Since we also find the evidence relevant, without regard to the question of whether the appellant was or was not intoxicated at the times of the sexual assaults, we find no merit to the first issue the appellant raised concerning the admissibility of evidence under MIL.R.EVID. 413. *See United States v. Dewrell*, 52 M.J. 601, 608 (A.F.Ct.Crim.App.1999) *aff'd.* 55 M.J. 131 (2001)(noting that "prior *dicta* on this issue have intimated, in view of the language Congress used in Rules 413 and 414, relevancy is all but mandated.")

The second concern the appellant raises, relative to the admissibility of the evidence of the previously committed sexual assault upon EN3 R, is that the balancing test conducted by the military judge was inadequate. While the appellant acknowledges that the military judge did perform a balancing test under MIL.R.EVID. 403, he contends it was inade-

---

6. The only evidence presented of the appellant's drinking on the night of the rape came through the testimony Thibodeaux. He testified that he

had seen the appellant drinking that night, but he did not know how much he drank. Record at 449.

quate in light of *Wright* and *United States v. Enjady,* 134 F.3d 1427 (10th Cir.1998).

■ We review the military judge's decision to admit evidence under an abuse of discretion standard. *Dewrell,* 55 M.J. at 137; *United States v. Manns,* 54 M.J. 164, 166 (2000). Furthermore, when reviewing a decision to admit evidence under MIL.R.EVID. 413, "the M.R.E. 403 balancing test is to be applied in a broad manner which favors admission." *Dewrell,* 52 M.J. 601, 609; *see also Wright,* 53 M.J. at 482.

■ In this case it is clear that the military judge conducted a balancing test under MIL.R.EVID. 403. He detailed his thought process in the following manner.

> Because of the potentially explosive nature of this evidence, balancing under MRE 403 is critical. The 1995 Report of the Judicial Conference of the United States, as cited in Analysis of MRE 413, suggests salient factors that should be considered in balancing under MRE 403:
>
> 1. The length of time between each extrinsic offense and the charged offense. About six months elapsed from the date of the Vella Gulf incident to the date of the charged rape. Such a period of time does not unduly attenuate the propensity of the accused.
>
> 2. Similarities between the charged and extrinsic offenses. Although certainly not identical, there is sufficient similarity in the two incidents to fairly construct a rational argument for propensity.
>
> 3. Frequency of past incidents. Only one past incident involving EN3 R[ ] is at issue. There is little danger that the members would find a pattern of previous incidents of sexual assault and put too much weight on previous misconduct.
>
> 4. Related surrounding circumstances and intervening events. Although the accused was promptly punished for indecent acts against EN3 R[ ], he was later found by the administrative discharge board not to have committed misconduct. He was notified of that finding soon thereafter. Within about two months, he was implicated in the rape of [Airman A]. The intervening event of the "no misconduct" result

of the discharge board may have strengthened the propensity of the accused.

> There is clearly some danger of unfair prejudice, confusion of the issues and undue delay in the trial on the merits. However, taking into account all of the foregoing, the Court concludes that the probative value of the evidence of the accused's indecent acts upon EN3 R[ ] substantially outweighs such dangers. To mitigate and hopefully prevent such dangers, the Court will instruct the members on how they may consider such evidence.

Appellate Exhibit XII at 3–4.

Our superior court has detailed "[s]ome of the factors to be examined when conducting a balancing test ..." for MIL.R.EVID. 413 evidence under MIL.R.EVID. 403. *Wright,* 53 M.J. 476, 482, citing *Enjady,* 134 F.3d at 1433. The appellant was, however, tried prior to either of those two cases being decided. Furthermore, the *Wright* factors are "neither exclusive nor exhaustive." *Dewrell,* 55 M.J. at 138.

Here the military judge made a careful and reasoned analysis on the record that satisfied all the requirements of MIL.R.EVID. 413 and 403. The evidence met all the threshold requirements for admission as MIL. R.EVID. 413 evidence, and the military judge conducted an adequate balancing analysis that is fully explained on the record. Such a ruling is not only reviewed for an abuse of discretion, but is accorded considerable deference. *Dewrell,* 55 M.J. at 138. Particularly in light of the broad application of MIL. R.EVID. 403 concerning evidence offered under MIL.R.EVID. 413, we find no abuse of discretion in this case. Accordingly, the military judge did not err in admitting evidence of the appellant's prior sexual assault of EN3 R.

### Sufficiency of the Evidence

In his second assignment of error, the appellant alleges that the evidence against him was neither legally, nor factually sufficient to allow this court to sustain his conviction. First, he argues that the evidence does not establish beyond a reasonable doubt that a penis penetrated Airman A's vagina. Second, he argues that if there was an act of

sexual intercourse, the evidence does not establish beyond a reasonable doubt that it was accomplished by force and without the consent of Airman A.

■ In examining the issue of whether the evidence of record is legally sufficient to sustain a conviction, this court will view the evidence in the light most favorable to the prosecution, and determine whether the trier of fact could have found each of the essential elements beyond a reasonable doubt. When conducting this examination we will draw every reasonable inference from the record in favor of the prosecution. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987)(citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A.1993)(quoting *United States v. Blocker*, 32 M.J. 281 (C.M.A.1991)). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *United States v. Torres–Rodriguez*, 37 M.J. 809, 810 (N.M.C.M.R.1993). The term reasonable doubt, however, does not mean that the evidence must be free from all conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986).

With respect to the charged specification of rape, there are but two elements: that the appellant committed an act of sexual intercourse; and that the act of sexual intercourse was done by force and without the consent of Airman A. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 45b(1). In defining the nature of the act, ¶ 45c(1)(b) explains that:

> Consent ... may not be inferred ... where the victim is unable to resist because of the lack of mental or physical faculties. In such a case there is no consent and the force involved in penetration will suffice. All the surrounding circumstances are to be considered in determining whether a victim gave consent....

*Id.* at ¶ –45c(1)(b). Applying the above standards of review and cognizant of the guidance contained in the Manual for Courts–Martial concerning the issue of consent, we find the evidence both legally and factually sufficient to sustain the appellant's conviction for rape.

■ The two specific issues the appellant raises merit some discussion. Given the victim's inability to definitely say what penetrated her vagina, the appellant's concern that the evidence that he actually inserted his penis into her vagina is insufficient to establish that element of the offense is reasonable. The victim's testimony on this issue is as follows:

> Q. Can you describe for the members, if you can, what you mean when you say you felt penetration.
> A. I felt something that I believe was a male—a male gender penetrate me, go——
> Q. When you say male gender—I'm sorry I have to ask like this but could you be more specific what you are referring to?
> A. His Penis.
> Q. I want to ask you this. As you sit here today, are you one hundred percent sure that what you felt penetrate you was a penis?
> A. I am not one hundred percent sure, sir, that it was a penis but I think it was a penis.

Record at 371–72. However, there is other evidence as well. Vaginal swabs taken from the victim revealed sperm that could not have been more than three days old. The victim also testified that she had felt weight on top of her and recalls the door opening. Her testimony is corroborated by the testimony of Petty Officer White, who saw the appellant jump—as if startled—when she opened the door to the room. When she asked if everything was okay, the appellant said it was. *Id.* at 404, 410. Then, the day after the incident, the victim had vaginal pain describing it as "feeling like someone had sex with you and you were not ready." *Id.* at 387. When viewing this evidence, and all the other evidence surrounding the incident—to include the appellant's statement that he believed he had a chance with the victim—we have no trouble finding beyond a reasonable doubt that the appellant placed his penis into Airman A's vagina.

■ With respect to the issue of whether the act of sexual intercourse was done with

force and without the consent of Airman A, we also look to all the surrounding circumstance of the act. Although the Government presented substantial evidence at trial concerning the victim's state of intoxication, it did not rely solely upon the theory that the victim was incapable of giving consent. In fact, Airman A testified that she put her hands up and tried to push the appellant away, and that she also remembered putting her feet up and trying to push him away with her feet. Additionally, the evidence establishes that the appellant did not know Airman A prior to the night of the rape, but still thought that he had a chance with her.

The record also makes clear that the victim was very intoxicated that evening and by the time she returned to her room, had very limited physical control of her faculties. Her roommate testified to her surprise at seeing Airman A's state of dress when she [the roommate] returned to the room, because she did not think Airman A was capable of any physical activity that night due to her state of intoxication. In short, this is not a "he said/she said" case. It is an unrebutted "she said" case, with other evidence that corroborates a scenario strongly suggestive of rape. Based upon our review of all this evidence we are convinced beyond a reasonable doubt that the appellant had sexual intercourse by force and without the consent of Airman A. Actual and constructive force are both present. Not only did the appellant overcome Airman A's limited resistance to his sexual advances, but she also lacked the ability to consent due to her state of intoxication, which resulted in the substantial loss of both mental and physical faculties. In such cases, "the force involved in penetration will suffice." MCM, Part IV, ¶ 45b(1).

### Conclusion

Accordingly, we affirm the findings and sentence as approved by the convening authority.

Chief Judge LEO and Judge VILLEMEZ concur.