UNITED STATES

v.

Thomas J. SCHNABLE, Sonar Technician Chief (E–7), U.S. Navy.

NMCM 9900852.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 11 Feb. 1999.

Decided 28 April 2003.

---

J. Byron Holcomb, Civilian Defense Counsel.

LT Glenn Gerding, JAGC, USNR, Appellate Defense Counsel.

LT Frank L. Gatto, JAGC, USNR, Appellate Government Counsel.

Before OLIVER, Chief Judge,
VILLEMEZ and HARRIS, Appellate
Military Judges.

OLIVER, Senior Judge:

Officer and enlisted members, sitting as a general court-martial, tried Appellant in early February 1999. Contrary to his pleas, the court-martial found Appellant guilty of four specifications of indecent acts with a minor and one specification of communicating a threat, all in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The members sentenced Appellant to confinement for 20 years, forfeiture of all pay and allowances, reduction to pay grade E 1, and a dishonorable discharge.

On 14 May 1999, the convening authority approved only so much of the sentence as provided for reduction to pay grade E–1, confinement for a period of 20 years, and a dishonorable discharge. Moreover, in a further act of clemency, the convening authority suspended all confinement in excess of 15 years for a period of 15 years from the date sentence was announced. In addition, the convening authority deferred Appellant's adjudged forfeitures and reduction in rate and waived automatic forfeitures for a period of 6 months from the date of the convening authority's action to aid Appellant's dependents.

We have carefully examined the record of trial and the various briefs and ancillary documents both parties have filed. After careful review, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of Appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## I. Factual Overview

On the morning of Saturday, 5 September 1998, Appellant was at home with his family in Port Orchard, Washington. He and his wife were working around the home and yard and their children were helping or playing. At one point Appellant asked his adopted, mentally challenged, 13–year–old daughter, E, to join him in the garage. She testified that he fondled her inappropriately. She also testified that, some time later, Appellant committed additional indecent acts with her in the home's master bedroom and then while they were parked in his pickup truck alongside a two-lane highway some distance away.

After E told her mother, T, something about these indecent acts, her mother immediately drove all four children in her van to the Naval Hospital at the submarine base nearby. Hospital personnel examined E and, based on what they learned from E and her mother, contacted the Naval Criminal Investigative Service (NCIS). Later that same afternoon NCIS Special Agent Connolly contacted Appellant at his home and invited him to his office for an interview. During the interview process, Special Agent Connolly seized certain clothing Appellant was wearing. The shorts and shirts were similar to the clothing T and E had told him Appellant had been wearing that morning.

During the difficult days that followed, E made various additional statements concerning what had happened to her to medical treatment providers. Prohibited by a court order from returning to his home, Appellant expressed his feelings to some of his friends. One of these statements resulted in the charge of communicating a threat to kill his wife. The command then commenced court-martial proceedings against Appellant.

## II. Assignments of Error

Appellant has filed a total of 14 assignments of error, 12 in his initial brief and an additional two in a brief Appellant filed following a motion this Court granted, over Government objection, to file supplemental assignments of error out of time. We will consider each in the order Appellant has raised them.

## III. Legal Sufficiency

Appellant first contends that the evidence is legally insufficient as to the Charge and its five specifications. We disagree.

The elements of committing an indecent act with a minor are: (a) that the accused committed a certain act upon or with the body of a certain person; (b) that the person was under 16 years of age and not the spouse of the accused; (c) that the act of the accused was indecent; (d) that the accused committed the act with intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the accused, the victim, or both; and (e) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 87b(1).

The elements of wrongfully communicating a threat are: (a) that the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future; (b) that the communication was made known to that person or to a third person; (c) that the communication was wrongful; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MCM, Part IV, ¶ 110(b).

The test for legal sufficiency is whether, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found" Appellant guilty beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987)(citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). After reviewing the entire quantum of evidence in the record under this test, we have no difficulty concluding that it was legally sufficient to support all of the findings of guilty.

## IV. Factual Sufficiency

Appellant also contends that the evidence adduced at trial is factually insufficient. The test for factual sufficiency requires an even more searching examination of the record. "[A]fter weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this Court must itself be convinced of Appellant's guilt "beyond a reasonable doubt." *Turner*,

25 M.J. at 325; *see United States v. Sills*, 56 M.J. 239, 240–41 (2002). The evidence need not be free from all conflict for us to be convinced of an accused's guilt beyond a reasonable doubt. *United States v. Roberts*, 55 M.J. 724, 731 (N.M.Ct.Crim.App.2001), *rev. denied*, 56 M.J. 467 (2002). The fact-finder may "believe one part of the witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). However, we have applied the "traditional criminal law standard of proof beyond a reasonable doubt" to support each element of these offenses. *Sills*, 56 M.J. at 240.

## IVa. Indecent Acts with a Minor

█ Appellant argues that the evidence was factually insufficient to prove that he committed indecent acts with a minor as alleged. After carefully reviewing the evidence, we find that there is ample evidence to support the members' conclusion that Appellant committed four sets of indecent acts on three separate occasions with his adopted daughter, E.

E testified at length as to Appellant's acts of sexual molestation on the morning of 5 September 1998. With respect to the first and second specifications under the Charge, E testified that she went into the garage with Appellant because "he told me to." Record at 383. She testified that Appellant picked her up and had her legs "around him" and that appellant's hands were "around me." *Id.* at 384. According to her sworn testimony, Appellant also kissed E by "putt[ing] his tongue in [her] mouth" while in the garage. *Id.* at 396. E also testified that Appellant twice told her "not to tell," and that Appellant's hands went inside her pants and her "bottom." *Id.* at 386–87. After going in the house, E told her sister, L, what Appellant had done to her. *Id.* at 388. When asked why she didn't tell her mother what happened to her in the garage, E replied, "because dad was outside." *Id.* at 389.

E testified that Appellant committed additional criminal conduct some time later. Appellant came to see E while she was playing in her room. She testified that Appellant told her to come into his room. Appellant and E sat down on the bed and he "unzipped

his pants." *Id.* at 390. When asked what happened, E said "he rubbed his dingle ... [w]ith his hand ... [u]p and down." *Id.* E also testified that she "rubbed his dingle" because "he told me to." *Id.* When asked if Appellant touched her, E said "yes" and explained that he touched her "in my private part." *Id.* at 391.

E also testified that later that same morning Appellant took her for a ride in his truck, where he proceeded to molest her further. These actions provided support for Specifications 3 and 4 of the Charge. When E went to get the mail, Appellant offered her a ride in his truck, telling her that he would "help her get the mail." *Id.* at 394. After E got into Appellant's truck and the mail was retrieved, he took her to "someplace where I've never been" with "a lot of signs." *Id.*[1] Appellant began to touch E "in her private parts" on the "inside" of her shorts and underwear. *Id.* at 395–96. E specifically stated that Appellant's hands went "inside her body." *Id.* at 396. Appellant also "undid his pants" and "rubbed ... his dingle" until "yellow stuff came out." *Id.*

Appellant points to various parts of the record to claim that the evidence was exculpatory. However, after considering his arguments carefully, we remain convinced that the evidence establishes that he committed these indecent acts with his minor adopted daughter beyond a reasonable doubt. In particular, we find that Appellant's one-line argument that E "denied" that these incidents took place to be entirely unpersuasive. *See* Appellant's Brief at 8. Appellant apparently contends that since E answered "yes" to a series of his civilian attorney's questions during cross-examination, those answers constitute a denial that the incidents ever occurred. In doing so, Appellant overlooks the highly credible and vivid testimony that E gave during her direct examination. Furthermore, at the time of these so-called "denials," civilian defense counsel was asking complex, leading questions of this mildly mentally retarded minor when she was obviously tired of testifying.

We also note that E's direct testimony was consistent with her prior disclosures of the abuse to her mother and those who examined her in the hours and days afterwards. There was also DNA evidence implicating Appellant in these sexual assaults. Moreover, Appellant's actions and statements are consistent with a consciousness of guilt. Appellant and his wife, T, had a conversation just outside the hospital on the afternoon of the incidents. According to his wife's testimony, she asked, "Where'd you take [E]?" and "What's this about yellow stuff coming out?" Record at 318–19. After admitting that he had taken E for a ride, pulled over to the side of the road, and talked to her "about sex," Appellant expressed concern that, as a result of what he had done, "I'm going to be demoted to E–3." *Id.* at 319.

Appellant argued at trial and on appeal that, if E's allegations are correct, his actions would simply not have been reasonable. While we certainly agree that sexual assault of a child is unreasonable, indeed, unconscionable, the way in which Appellant went about it seems consistent with his designs. He first fondled and French kissed his daughter in a portion of a darkened garage. He then asked her not to tell anyone. Although she told her younger sister, L, Appellant did not know this. No doubt emboldened by her apparent silence, Appellant next attempted to have her masturbate him in his bedroom.

L's testimony that, when she found the two of them alone together in the master bedroom, Appellant turned away to zip up his shorts, is compelling support for E's version of events. Appellant then drove E away from the house in his truck, a virtually unheard-of break from his normal practice of never taking anyone else in his truck. While Appellant may well have risked discovery by sexually molesting his daughter while parked at the side of a country road, the photographs of the truck, with its canopy shell blocking the back window, hardly convince us that such a discovery was likely. Appellant took pains to tell E repeatedly that she was not to tell anyone what he had done to her.

---

1. This incident occurred over Labor Day weekend in the middle of the 1998 general election campaign. According to other evidence, political signs could be found in profusion displayed along the sides of area roads.

After all, her breaking this imposed code of silence was the most likely path to discovery. Appellant also took great pains to show that the sexual assault would have been incredible on the basis that their seat belts were fastened. However, during redirect examination E testified that Appellant was able to get the necessary access to her after each had unbuckled their seatbelts. *Id.* at 425.

Appellant also contends that the reports E made to her mother and medical personnel and her in-court testimony are not credible because she describes Appellant's ejaculate as "yellow." E testified that "yellow stuff" came out of appellant's "dingle" after they "rubbed it." *Id.* at 396–97. Furthermore, when asked whether the "yellow stuff" might have been "pee," E responded "No," explaining that it was "slimy." *Id.* at 398. Appellant argued at trial and now contends on appeal that this makes E's complaint inherently suspect, because, as is the case with every normal male, Appellant's ejaculate is white. However, an expert witness testified at trial that male ejaculate is a "substance that has variable color, usually off-white to slightly yellow ... [a]nd its quite sticky and tenacious." *Id.* at 492. Moreover, even if E is wrong regarding the actual color of Appellant's ejaculate because of errors in her perception or in her memory, we consider that to be of little consequence. We suspect that describing it as "yellow" and "slimy" is much more consistent with her life experiences than the more precise terms "off-white" and "tenacious."

We have considered all of Appellant's other arguments as to why the evidence should have raised a reasonable doubt in the minds of the triers of fact and of this Court. After doing so, we find more than sufficient evidence in the record to convince us, beyond a reasonable doubt, that Appellant committed the four specifications of indecent acts with a minor as alleged.

### IVb. Communicating a Threat

■ We also find sufficient factual evidence to support Appellant's conviction of wrongfully communicating a threat. The evidence is overwhelming that Appellant stated the words in the fifth specification to a third person, Ms. H. The expression of these words was wrongful, not made in jest or for any lawful purpose, and under the circumstances was prejudicial to good order and discipline and of a nature to bring discredit upon the armed forces.

Appellant contends that the evidence indicates that, at the time he stated those words, he had no actual "present intention of threatening anyone" and that "*no* alleged 'threat' ever took place." Appellant's Brief of 14 Mar 2002 at 5, 11. To support the finding of guilty, Appellant only needed to have made known to a third person a "present determination or intent" to injure a person "presently or in the future." MCM, Part IV, ¶ 110b(1). Moreover, as the Explanation in the Manual makes clear, "it is not necessary that the accused actually intended to do the injury threatened." MCM, Part IV, ¶ 110c. The military judge properly instructed the members as to these legal requirements. Record at 817.

The facts of record convince us of the four elements of this offense beyond a reasonable doubt. Ms. H testified that she had known Appellant for 13 years and that their families were close friends. Record at 508. Their families frequently had "family get-togethers, [at] their house or [her] house." *Id.* Ms. H testified that Appellant came to her house on Sunday, 11 October 1998. *Id.* at 509. While eating breakfast in the kitchen, Appellant approached her and told her "for the first time, that he had thought about killing his wife, and that way his children would be in a loving, foster-caring family, and that he would be in jail." *Id.*

Ms. H tried to disregard his comments, hoping that he was not serious. *Id.* She tried to tell him that he could not do that and that "she didn't want to hear anything like that," but Appellant insisted that he had really thought about it. *Id.* The conversation reached the point where they were "talking over each other" and Ms. H repeatedly said "No, no, you can't do that." *Id.* at 509–10. Ms. H described Appellant as "very upset" and "emotionally upset" during their exchange. *Id.* at 511. Appellant was behaving erratically, and speaking with "disconnected" sentences, and she had never seen him behave this way. *Id.* Appellant went so far as

to threaten Ms. H by stating that "if I said anything to [T], I would have to kill you." *Id.*[2]

Ms. H was so concerned about these threats that she could not sleep. After thinking about the conversation for a few days and as a family court hearing approached, she contacted the Schnable family's minister, Pastor C, and reported it to the Naval Criminal Investigative Service (NCIS). After speaking with her, Pastor C, who had known Appellant and his family for 10 years, also called NCIS because of his genuine "concern" over T's safety as a result of Appellant's threats. *Id.* at 450.

Appellant argues that, since Ms. H waited 3 days before contacting Pastor C and NCIS, she must have thought that he had merely been "venting" about the situation and he had no "present intention of threatening anyone." Appellant's Brief of 14 Mar 2002 at 5. He also notes that the Article 32, UCMJ, investigative officer recommended that this particular specification "be dismissed as having no factual basis." *Id.* at 6. However, Appellant only needs to have made known to a third person a "present determination or intent" to injure a person "presently or in the future." MCM, Part IV, ¶ 110(b)(1).

The fact that Appellant may have not planned to immediately carry out his threat is of no consequence to the matter. At Ms. H's kitchen table, Appellant manifested an intent to injure Mrs. Schnable at some point in the future. Furthermore, he continued to discuss the matter and even went so far as to threaten Ms. H should she tell Mrs. Schnable. Similarly, the recommendation of the Article 32 officer is not relevant in the determination of the court-martial or this Court as to whether or not the evidence establishes the elements beyond a reasonable doubt.

In concluding our review of Appellant's first assignment of error, we find that there is ample evidence for this Court to affirm Appellant's findings of guilty of each of these offenses beyond a reasonable doubt.

**2.** Although this statement itself constitutes uncharged misconduct, the evidence was admissible as part of the *res gestae,* the circumstances

## V. Seizure of Appellant's Clothing

Appellant made a timely motion at trial to suppress certain items of clothing that an NCIS agent had taken from him as evidence on the afternoon of 5 September 1998. After hearing evidence and considering the legal arguments of both sides, the military judge ruled that the evidence was admissible. Record at 100; *see* Appellate Exhibit XLVI (Findings of Fact.) This adverse ruling gives rise to Appellant's second assignment of error. After conducting our own review, however, we conclude that the military judge ruled correctly.

The lawfulness of a search or seizure involves a mixed question of law and fact. *See United States v. McCarthy,* 47 M.J. 162, 165 (1997). In cases involving mixed questions of law and fact, a military judge's factfinding is reviewed "under the clearly erroneous standard and conclusions of law under the *de novo* standard." *United States v. Kelley,* 45 M.J. 275, 280–81 (1996). To reverse, this Court "must be 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Walker,* 50 M.J. 749, 751 (N.M.Ct.Crim.App.1999)(citing *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

Military Rule of Evidence 316, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.) governs admissibility on evidence seized in a criminal investigation. The rule states, in relevant part:

(b) *Seizure of Property.* Probable cause to seize property or evidence exists when there is a reasonable belief that the property or evidence is an unlawful weapon, contraband, evidence of crime, or might be used to resist apprehension or to escape.

A law-enforcement official or other Government agent may seize property that he or she reasonably believes to be evidence of a crime without first obtaining a search warrant or search authorization under several exceptions. *See generally* MIL. R. EVID. 316(d). The two exceptions relevant to this case are as follows:

surrounding the charged offense. *See United States v. Metz,* 34 M.J. 349, 351 (C.M.A.1992).

(B) *Exigent circumstances.* The person has probable cause to seize the property or evidence and under Mil. R. Evid. 315(g) a search warrant or search authorization is not required;

(C) *Plain view.* The person while in the course of otherwise lawful activity observes in a reasonable fashion property or evidence that the person has probable cause to seize.

MIL. R. EVID. 316(d)(4)(B); 316(d)(4)(C). Mil. R. Evid. 315(g) specifically exempts a law enforcement officer from obtaining a search authorization when there is "a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought."

As the U.S. Supreme Court has observed, "[p]robable cause deals with probabilities." *Illinois v. Gates,* 462 U.S. 213, 241, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The standard for probable cause is "only a probability, and not a prima facie showing, of criminal activity . . . ." *Id.* After a careful review of the relevant facts, we concur with the military judge's determination that the NCIS Agent had probable cause to seize Appellant's clothing as potential evidence of a crime without a warrant, because (1) of exigent circumstances and (2) the evidence was in plain view.[3]

### Va. Exigent Circumstances

■ The law permits a warrantless seizure of potential evidence when a law-enforcement official has probable cause to seize the material and exigent circumstances exist under Mil. R. Evid. 315(g). MIL. R. EVID. 316(d)(4)(B). Exigent circumstances include when such an officer has a "reasonable belief that the delay necessary to obtain a . . .

search authorization would result in the removal, destruction, or concealment of the property or evidence sought." MIL. R. EVID. 315(g)(1).

In this case, the military judge properly ruled exigent circumstances excused the absence of a search authorization.[4] Agent Connolly had probable cause to believe Appellant may have sexually abused his adopted daughter. E had stated that Appellant had ejaculated and that he wiped some of the ejaculate off with his t-shirt. The NCIS agent testified that he thought there also may be evidence on the shorts and underwear because "[w]ith ejaculation, it shoots up, and it could go—land anywhere [because of] seepage." *Id.* at 89. He also attempted to contact Appellant's commanding officer but was unsuccessful until later that evening. Finally, since Appellant was not apprehended at that point, he was free to leave and could have easily destroyed the evidence by washing or disposing of his clothing.

### Vb. Plain View

■ There is a second strong legal basis that this evidence was admissible at trial. Mil. R. Evid. 316(d)(4)(C) authorizes seizure by a law enforcement agent, when "while in the course of otherwise lawful activity observes in a reasonable fashion property or evidence that the person has probable cause to seize." The seizing officer must also "have probable cause to believe the item is contraband or evidence of a crime." *United States v. Fogg,* 52 M.J. 144, 149-50 (1999).

Here, Appellant voluntarily met with the NCIS Agent the afternoon the child sexual abuse offenses were allegedly committed, and was acting in the course of otherwise lawful activity. *See* MIL. R. EVID. 316(d)(4)(C). Appellant arrived at NCIS

---

3. The military judge also concluded that this clothing was admissible as evidence on the basis of "inevitable discovery" under Mil. R. Evid. 311(b)(2). Appellate Exhibit XLVI at 1, 3. While we agree that this is true, the more applicable theories on these facts are these two.

4. Specifically, the military judge found "given the circumstances surrounding the fact that these are shorts, the evidence is evidence that could be washed away easily. But there is certainly an issue of as to whether there could be destruction of evidence. Whether there's a reasonable belief,

I think that's evident given the circumstances concerning the agent's understanding. . . . [H]e has fairly well established the fact that his belief was at the time that he had a suspect, that he had a victim, that he had reason to believe that there would be evidence found on the shirt, and by his own analysis, potentially the shorts and the underwear. So I think the Government has at least made a case concerning the concept of exigent circumstances." Record at 97. *See also* Appellate Exhibit XLVI at 3.

wearing a red t-shirt and shorts that closely fit the description provided by E and Mrs. Schnable. As discussed, this created probable cause to seize Appellant's clothing.

The NCIS agent also had "reason to believe that there is a possibility of evidence on ... not just the shirt, but the shorts and the underwear." Record at 100. Even though E said Appellant wiped his ejaculate with the t-shirt, the NCIS agent had reason to believe that the ejaculate could have landed on other items of clothing due to the expected nature of ejaculation. Furthermore, Mrs. Schnable indicated that after seeing Appellant earlier at the hospital, she did not think he had yet changed his clothes. Once Appellant's shorts and t-shirt were lawfully seized at the Bangor gym, Appellant's underwear was in plain view. It was reasonable for the NCIS Agent to anticipate that evidence of ejaculate would also be present on Appellant's underwear. Accordingly, the seizure of Appellant's clothing was also lawful under the "plain view" exception to the warrant requirement. MIL. R. EVID. 316(d)(4)(C).

Finally, Appellant argues that the seized clothing should have been suppressed because there is no indication of the age of the semen stains, and no evidence of how it was introduced onto the clothing. We disagree. First, the fact that the age of the semen stains found on Appellant's clothing goes to the weight, rather than the admissibility, of the evidence. Second, there is ample evidence of how the semen likely was introduced onto the clothing. E testified at length that appellant repeatedly molested her by touching her "private parts." Record at 395–98; see Government's Brief of 18 Dec 2001 at 5–8. She also testified that Appellant rubbed his penis and also had her rub his penis until he ejaculated and wiped off his ejaculate with his shirt. E's testimony provides convincing evidence of how Appellant's semen came to be on his clothing.

We find that the military judge's factual findings and the conclusions of law on this issue were entirely correct and that he ruled properly in denying Appellant's motion to suppress the evidence. *United States v. Ayala*, 43 M.J. 296, 298 (1995). Accordingly, we find that the evidence was properly admitted.

## VI. Testimony Concerning the Victim's Mental Condition

In a third assignment of error, Appellant contends that the military judge erred by permitting E's mother to testify that the victim in this case, her adopted daughter, suffered from a mild degree of mental retardation. We disagree.

Mil. R. Evid. 701 states that a lay witness may testify to an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness of the determination of a fact in issue." MIL. R. EVID. 701. The rule imposes two requirements. The first is that the opinion must be rationally based on perceptions of the witness. *Id.* Finally, that opinion must be helpful to the trier of fact. STEPHEN A. SALTZBURG, ET AL., MILITARY RULES OF EVIDENCE MANUAL (4th ed.1997) at 830; see MIL. R. EVID. 701. Mrs. Schnable's testimony regarding E's retardation satisfies all of these requirements.

First, Mrs. Schnable is a mother of six children who was never employed outside the home during her marriage. E joined Mrs. Schnable's family after she was adopted when she was 2 years old. At the time of the offenses, E was 13 years of age. Mrs. Schnable testified as to the details of E's underdeveloped physical and mental conditions when they first adopted her and that she was "diagnosed with mild retardation." Record at 301–02.

After 4 years of home schooling, E was placed back in a special education program at elementary school. E also suffered from a speech impediment, and had received speech therapy since she was 3 years old. Mrs. Schnable also testified that E was not performing at the same level as her other children in both math and reading.

Second, Mrs. Schnable's opinion is rationally based on these perceptions in her capacity as a mother and a teacher. As the military judge properly noted, you do not have to "be an expert if you're a parent who's been around that child for the length of time that

[Mrs. Schnable] has and who has been witness to school tests, and other developmental measurements, and medical tests, and other things that come over the course of time ...." *Id.* at 63. Mrs. Schnable was able to form an opinion because she was privy to such facts as the child's mother and teacher.

Finally, we find that Mrs. Schnable's testimony on this point was quite helpful to the trier of fact in determining facts at issue. At trial, the members heard the testimony of a 13 year old child who was frequently unable to communicate certain information expected of an average young teenager. She had obvious difficulty understanding some of the questions posed. Without placing her cognitive level into some context, the members might well have misunderstood her situation at the time of the offense and at the time of trial. *See United States v. Jones,* 26 M.J. 197, 198–99 (C.M.A.1988). Furthermore, the members were presented with a "small and short" child who likely did not appear to be 13 years old. Her answers could have easily appeared appropriate for her physical size, but not necessarily her age. For these reasons, E's level of mental functioning is helpful for the members to assess her credibility, and allowed the members to clearly understand E's testimony. It also helped explain inconsistencies in her testimony.

Appellant argues that "[r]etardation is the subject of an expert witness under Mil. R. Evid. 702 and should [sic] have been done in this case." Appellant's Brief of 14 Mar 2002 at 15. Appellant's reliance on this rule is misplaced. Mil. R. Evid. 702 permits a witness qualified as an expert to testify in a particular area if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence...." MIL. R. EVID. 702. The key question in determining the appropriateness of the expert testimony is whether it would "assist the trier of fact." *United States v. Kyles,* 20 M.J. 571, 575 (N.M.C.M.R.1985). Mrs. Schnable did not attempt to describe or express an expert opinion as to E's level of impairment. *Compare Jones,* 26 M.J. at 198–200 (noting that testimony about how a mentally retarded person would react under questioning during an interview is the proper subject of expert

opinion testimony under Mil. R. Evid, 702). She simply testified to matters that she had observed, and on the basis of facts known to her as E's mother. An expert in this field was neither justified nor required under these circumstances.

We conclude that the military judge did not abuse his discretion by allowing Mrs. Schnable to make reference to her daughter's mental retardation. *Kyles,* 20 M.J. at 575. Accordingly, we find that Appellant is entitled to no relief.

## VII. Exclusion of Videotape Evidence

■ In a fourth assignment of error, Appellant contends that the military judge erred to his substantial prejudice by barring the introduction of a videotape defense counsel had developed in preparing for trial. This videotape purported to show the route Appellant told his counsel he had taken with E and the place they had parked on the morning in question. He wanted to introduce it before the members to help prove his theory that there were far more secluded places to molest his child than on the side of a busy highway. On the facts of this case, we find that the military judge ruled correctly.

A videotape is considered a "photograph" under the Military Rules of Evidence. *United States v. Harris,* 55 M.J. 433, 438 (2001); *see* MIL. R. EVID. 1002. Consequently, the admissibility of a videotape is governed by the same rules and principles regarding authentication of photographs in Mil. R. Evid. 901. *Harris,* 55 M.J. at 438–39. By ensuring that a proper foundation is laid or that a document is properly authenticated, the military judge is guaranteeing that the court members could find that particular evidence is what it purports to be. MIL. R. EVID. 901(a). A military judge's ruling on whether to admit evidence is reviewed for an abuse of discretion. *United States v. McElhaney,* 54 M.J. 120, 129 (2000); *see Harris,* 55 M.J. at 438 (videotape evidence). A reviewing court will not set aside a trial court's ruling unless it has a "definite and firm conviction that it was a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Houser,* 36 M.J. 392, 397 (C.M.A.1993).

In this case, Appellant wanted to admit a videotape purportedly filmed along the roadway where E was alleged to have been sexually abused. The purpose of the videotape was to try and demonstrate to the members that Appellant would more likely have "pulled off the roadway into areas of extreme privacy if he were at all prone to do an indecent act towards a child." Appellant's Brief of 14 Mar 2002 at 17; *see* Record at 727. This videotape was filmed by civilian defense counsel and trial defense counsel in February 1999, apparently following a route Appellant had shown them. Civilian defense counsel unsuccessfully sought to admit the tape based on his own representation that "he was told [by Appellant] that was the route." Record at 731. Appellant now claims that the videotape should have been admitted under "Mil. R. Evid. 802(24) or 804," and that he "should not have to take the stand" in order to have the evidence admitted. Appellant's Brief of 14 Mar 2002 at 17. This argument is incorrect.

The military judge excluded the videotape at trial because Appellant had failed to lay a proper foundation that authenticated the videotape's contents.[5] Appellant must put on evidence sufficient to support a finding that the contents of the videotape are what he claims them to be. MIL. R. EVID. 901(a). In this case, Appellant could only make this showing via the testimony of a witness with knowledge that the contents of the videotape depict a particular scene. MIL. R. EVID. 901(a)(b)(1). The only "witnesses with knowledge" would be the only people in the truck on the morning of the offense—E and Appellant. E was unable to testify as to a specific route or location. Record at 394 (stating only that Appellant took her "someplace where [she had] never been" with "signs" and "cars"). Of course, Appellant had the opportunity to establish the videotape's foundation by testifying, but exercised his right not to do so. Therefore, Appellant failed to demonstrate that the videotape fairly and accurately depicted the purported path that he drove with E. *Reichart*, 31 M.J. at 523. The admissibility of the videotape under Mil. R. Evid. 803(24) or 804 has no consequence because the military judge did not exclude Appellant's evidence on hearsay grounds. Record at 730–31; Appellant's Brief of 14 Mar 2002 at 17. Furthermore, Appellant did not seek admission of any videotaped statements or assertions, but a route that he had allegedly driven on the morning in question. Therefore, review under the hearsay evidence rules is inappropriate.

Appellant could have introduced evidence, including testimony and photographic recordings of secluded areas near his home to make his point, that there were more secretive areas within a short drive of his home where he might have molested his daughter had he been prone to do so. The military judge never limited Appellant's introduction of evidence to this effect. He merely barred the introduction of a videotape based on representations from Appellant's counsel that it replicated the route Appellant and E took that morning. The members were quite aware, based on other evidence adduced at trial, that there were secluded places to drive and park in the vicinity of Appellant's home. Appellant's counsel had no trouble arguing this very point to the members. We find that this videotape was not crucial to establishing this defense theory.

We find that the military judge's exclusion of the videotape was not error. Rather, it demonstrates the military judge's sound understanding of the rules of evidence. We conclude that the decision to exclude the videotape as offered was quite correct.

## VIII. Admissibility of Exculpatory Statements Appellant Made to His Pastor

In a fifth assignment of error, Appellant contends that the military judge erred when he denied his request to have his pastor testify that, during a counseling session after

---

5. The military judge stated: "I have told you that this was going to be a problem since the moment you mentioned this videotape, so this particular evidentiary hurdle shouldn't be new to you, and you have told me that you understand that the only way this tape's going to come in is if some-one is testifying or there's some evidence that this was the route that was taken. And I have capsulized for you the state of the evidence as I remember it concerning the route, and it in no way suggests that any tape you would show was the route that was taken." Record at 730.

the incident in question, Appellant had made certain exculpatory statements. We disagree.

Hearsay is defined as a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MIL. R. EVID. 801(c). Appellant sought to offer statements he had made to Pastor C, apparently denying that he had ever sexually abused E. These statements would clearly qualify as hearsay since: (1) they had been made out of court; and (2) Appellant offered them for the truth of the matter asserted.

■ Appellant's statements to his pastor constitute self-serving hearsay. Unless required by "the rule of completeness in Rule 304(h)(2)," *United States v. Gilbride*, 56 M.J. 428, 430 (2002), "a self-serving, exculpatory declaration made by an accused is hearsay and inadmissible in evidence." *United States v. Condron*, 17 C.M.A. 367, 372, 38 C.M.R. 165, 170, 1968 WL 5360 (1968)(Quinn, C.J. dissenting)(citing *United States v. Harvey*, 8 C.M.A. 538, 25 C.M.R. 42, 1957 WL 4645 (C.M.R.1957)).

■ In the instant case, Appellant sought to introduce his denial of wrongdoing through the testimony of Pastor C, instead of actually taking the stand himself. *See* Appellant's Brief of 14 Mar 2002 at 20 (conceding that Appellant "wanted his statements admitted, not a belief or opinion"). This is precisely the type of inadmissible hearsay that the rule prohibits. *See* MIL. R. EVID. 801(c). Indeed, if this type of evidence were admissible at trial, any accused could put his exculpatory "side of the story" before the court-martial, while avoiding cross-examination, by telling what he wanted the Court to hear to a clergyman or other trustworthy person, and then having that person testify at trial on his behalf. The military judge did not abuse "his wide discretion" in barring the introduction of this evidence. *United States v. Redmond*, 21 M.J. 319, 326 (C.M.A.1986).

## IX. Admissibility of Statements Made to Medical Personnel

In a sixth assignment of error, Appellant contends that the military judge erred when he permitted a nurse, Ms. Graf, to testify as to what E had told her during a sexual assault examination she conducted, and an investigator, Ms. Conrad, to testify as to the circumstances surrounding E's initial interview. Once again, we disagree.

As discussed above, hearsay offered to prove the truth of the matter asserted is generally inadmissible. MIL. R. EVID. 801(c) and 802. However, under the "medical exception" to the hearsay rules, the Military Rules of Evidence provide:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) *Statements for purposes of medical diagnosis or treatment.* Statements made for the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

MIL. R. EVID. 803(4); *see generally United States v. Haner*, 49 M.J. 72, 76 (1998).

Whether a statement is admissible under this rule depends on the state of mind of the declarant; the guarantee of reliability is premised on the assumption that a patient seeking diagnosis or treatment from a doctor will tell the truth to receive the best possible medical diagnosis and treatment. *United States v. Faciane*, 40 M.J. 399, 403 (C.M.A. 1994). The timing of the medical examination is usually not a factor in determining the admissibility of the statements under Rule 803(4), even where there has been a significant lapse of time. *See United States v. Whitted*, 11 F.3d 782, 787 (8th Cir.1993)(finding a victim's statements to a physician admissible under medical exception where examination was "nearly three years after the last alleged act of abuse"). Similarly, the fact that the declarant was referred to the medical examination by law enforcement is not a significant factor in determining admissibility under the rule. *Haner*, 49 M.J. at 76 (observing: "The fact that [the beaten wife] was referred to the hospital [by the district

attorney who wanted injuries documented for prosecution] is not a critical factor in deciding whether the medical exception applies to the statements she made to those treating her.").

■ In applying the medical exception, our superior Court has only required that evidence offered under Mil. R. Evid. 803(4) satisfy a two-pronged test:

> "[F]irst the statements must be made for the purposes of 'medical diagnosis or treatment'"; and second, the patient must make the statement "with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought." A key factor in determining whether the second prong is met is "the state of mind or motive of the patient in giving the information ... and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed."

*Faciane*, 40 M.J. at 403 (quoting *United States v. Edens*, 31 M.J. 267, 269 (C.M.A. 1990)); *see also United States v. Ureta*, 44 M.J. 290, 297 (1996).

Regarding the second prong, it is well-settled that child sexual abuse cases may require the traditional adult standards to be relaxed when applied to very young victims. *See, e.g., United States v. Quigley*, 40 M.J. 64, 66 (C.M.A.1994); *Edens*, 31 M.J. at 269 (affirming a conviction for child sexual abuse and acknowledging that, regarding the requirement of making the statement with some expectation of receiving medical treatment, "there may be some relaxing of the quantum of proof in those situations where a child is being treated.").

■ Appellant argues that the military judge erred by allowing Ms. Graf to testify because her testimony does not satisfy "any of the exceptions to the hearsay rule." Appellant's Brief of 14 Mar 2002 at 21. He is mistaken. To the contrary, the military judge's ruling was well-supported by the testimony in the record.

The statements E made to Ms. Graf during her medical evaluation were clearly made for the purpose of medical treatment or diagnosis. *Ureta*, 44 M.J. at 297; Mil. R. Evid.

803(4). E was evaluated at a sexual assault clinic in a hospital setting that handles follow-up evaluations for victims of alleged sexual abuse. E's mother testified that she "knew what a hospital is for" because the family has so many children with many "broken arms and sicknesses." Record at 318. Mrs. Schnable also explained that when she goes to the hospital, E "knows they're there to help her and get better." *Id.* E explicitly indicated this understanding when she testified that you "go to doctors ... [w]hen you're sick," and "go to nurses ... [w]hen you're hurt." Record at 403.

Furthermore, Ms. Graf testified that she identified herself as a "special kind of nurse who looks at children in a very special way." Record at 530. Ms. Graf also explained to E that she would take a medical history, conduct an examination, and provide treatment to her if necessary. *Id.* at 533. E's evaluation was conducted in an "actual medical examination room" in a hospital environment. *Id.* at 534. As such, the military judge properly found that E made these statements with "an expectation of medical treatment," and that "she knew it was to promote her well-being." *Id.* at 537. Consequently, both prongs of the medical exception to the hearsay rule were satisfied. *Ureta*, 44 M.J. at 297; Mil. R. Evid. 803(4).

After applying all of the relevant principles of law to the factual situation developed at trial, the military judge ruled that Ms. Graf's testimony was admissible. We see no reason to disturb this conclusion.

Finally, Appellant argues that Ms. Conrad's testimony also should have been suppressed *sua sponte* because her "testimony is not allowed under any exceptions to the hearsay rule." Appellant's Brief of 14 Mar 2002 at 21. Appellant's argument is flawed because Ms. Conrad did not testify about any hearsay statements that E made to her during her interview. *See* Record at 622–27 (indicating an absence of testimony as to any statements E made to Ms. Conrad). Instead, Ms. Conrad was called on for the purpose of explaining how her interview of E was conducted. Trial counsel recognized that E's statements to Ms. Conrad would be barred by the hearsay rule, and only called

her to clarify how E was referred to Ms. Graf. Moreover, the Government properly called Ms. Conrad to rebut allegations of witness contamination Appellant's civilian defense counsel had made. *See id.* at 575, 585. Finally, we note that Appellant never objected to Ms. Conrad's testimony. Accordingly, Appellant has not shown that the military judge abused his discretion in letting the members hear this testimony.

## X. Sentence Appropriateness

■ In a seventh assignment of error, Appellant contends that his sentence is inappropriately severe. We disagree. While our experience with cases of this kind indicates that this sentence is more severe than most, we find that it was not so harsh as to demand judicial relief.

A court-martial is free to impose any legal sentence that it determines is appropriate. *United States v. Turner,* 14 C.M.A. 435, 437, 34 C.M.R. 215, 217, 1964 WL 4998 (1964); R.C.M. 1002. On review, a court of criminal appeals "may affirm only such findings of guilty and the sentence or such part or amount of the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ. Courts of criminal appeals are tasked with determining sentence appropriateness vice clemency. Clemency, which involves bestowing mercy, is the prerogative of the convening authority. *United States v. Healy,* 26 M.J. 394, 395–96 (C.M.A.1988); R.C.M. 1107(b). An appropriate sentence results from an "individualized consideration" based on "the nature and seriousness of the offense and the character of the offender." *United States v. Rojas,* 15 M.J. 902, 919 (N.M.C.M.R.1983)(citing *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982)), *aff'd,* 20 M.J. 330 (C.M.A.1985).

In this case, Appellant sexually molested his 13–year–old daughter four times in three separate episodes on the same morning. Several days later he communicated a threat that he was thinking about killing his wife. Indeed, while he was telling his neighbor what he was thinking, Appellant threatened

Ms. H's life should she tell Mrs. Schnable of their conversation.

Appellant argues that the "sentence imposed by the members of 20 years confinement is in itself crazy." Appellant's Brief of 14 Mar 2002 at 21 (later in his brief Appellant argues "THIS IS AN OUTRAGE IN ITSELF WITH THE MEMBERS RUNNING AMOK." *Id.* at 22.) To the contrary, Appellant received the degree of punishment the members considered appropriate based on these unconscionable offenses. Furthermore, the members, in adjudging an appropriate sentence, and the convening authority, in approving the sentence, obviously considered the fact that Appellant was a chief petty officer at the time of the offenses. Charge Sheet. Indeed, the premise that senior enlisted personnel may be held to a higher standard of accountability for their conduct than junior enlisted members is well-established in military law. *See United States v. Thompson,* 22 M.J. 40, 41 (C.M.A.1986). This is not "running amok." The sentence was based on the members' evaluation of the nature of the offenses and the character of the offender. *See Snelling,* 14 M.J. at 268.

Additionally, we note that the convening authority granted extensive clemency to Appellant. He suspended all confinement in excess of 15 years, deferred and disapproved adjudged forfeitures, deferred the adjudged reduction in rate, and waived automatic forfeitures for the maximum period the law allows. *See* Convening Authority's Action of 14 May 1999 at 2. Clemency is the prerogative of the convening authority, not this Court. *Healy,* 26 M.J. at 395–96; R.C.M. 1107(b). Appellant's assignment of error simply amounts to another request for clemency, which we are neither inclined nor authorized to grant. We find that no further relief is appropriate.

## XI. Unsuccessful Request to Enter An *Alford* Plea

In an eighth assignment of error, Appellant contends that the military judge erred when he refused Appellant's request to enter a plea in which he did not admit guilt under *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[6] We dis-

---

6. Appellant petitioned this Court on two prior

occasions with respect to this issue. First, he

agree; the military judge properly applied the appropriate principles of law.

Article 45(a), UCMJ, 10 U.S.C. § 845, makes clear that such a plea is not authorized:

> If an accused after arraignment makes an irregular pleading, or after a plea of guilty sets up a matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, ... a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty.

In other words, Article 45(a), UCMJ, is a "codal mandate to reject a guilty plea if the accused 'sets up [a] matter inconsistent with the plea....'" *United States v. Roane*, 43 M.J. 93, 98 (1995). Accordingly, the military judge cannot accept a plea of guilty, and must enter a not guilty plea, whenever an accused makes any declaration that amounts to a claim of innocence. Art. 45(a), UCMJ; *United States v. Brooks*, 43 C.M.R. 945, 952, 1971 WL 12912 (A.F.C.M.R.1971). R.C.M. 910(a)(1) lists the authorized pleas available to an accused at court-martial; *Alford* pleas are not included. R.C.M. 910(a). Furthermore, the Discussion to that rule clarifies that an irregular plea is one "such as guilty without criminality." R.C.M. 910(b), Discussion. Our superior Court has specifically stated that "[t]here may not be an [*Alford*] plea in the military." *United States v. Figura*, 44 M.J. 308, 309 (1996)(citing *United States v. Epps*, 25 M.J. 319, 321 (C.M.A. 1987)).

Appellant nonetheless reasserts his claim that he has a right to plead guilty without acknowledging criminality, suggesting that his position is bolstered by the decision in *United States v. Davis*, 50 M.J. 426 (1999). *See* Appellant's Brief of 14 Mar 2002 at 23–28. The holding in *Davis*, although reiterating the prohibition against accepting a confessional stipulation as part of a pretrial agreement not to raise any defense, *United States v. Bertelson*, 3 M.J. 314, 317 (C.M.A. 1977), was that the appellant "was not deprived of due process under the specific facts of this case." *Davis*, 50 M.J. at 430. Essentially, Appellant now seeks to have his case remanded so he can plead not guilty and enter into a confessional stipulation of testimony establishing his guilt. However, his reliance on *Davis* is misplaced. Appellant was always able to enter into a confessional stipulation of testimony. *Bertelson*, 3 M.J. at 316–17. *See* R.C.M. 811(c), Discussion. And, contrary to Appellant's assertion, our superior Court held that the specific pretrial agreement in *Davis* was error. *Davis*, 50 M.J. at 430.

Finally, even if this case were remanded, it is by no means certain that the convening authority would be inclined to enter into a pretrial agreement. *See* Appellant's Brief of 14 Mar 2002 at 24. And although Appellant claims his primary concern is family unity, the victim has already testified against Appellant during this contested court-martial. Thus, the "damage" to Appellant's family from his adopted daughter having to testify has already been done. No one can undo that damage. Furthermore, if protecting his family's unity was indeed Appellant's primary concern, nothing prevented him from pleading not guilty at his court-martial and stipulating to the expected testimony of his daughter. Accordingly, we again deny Appellant's request for relief.

## XII. Additional Assignments of Error

We have carefully examined each of the next four assignments of error Appellant submitted under *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). We find each to be without merit.

Our superior Court has held that Article 25, UCMJ, 10 U.S.C. § 825, and R.C.M. 912(b)(2) are a constitutional part of the military justice system. *United States v. Lov-*

---

requested extraordinary relief to allow him to plead guilty by means of an *Alford* plea. We denied relief and characterized Appellant's claim as "wholly inaccurate." *United States v. Schnable*, NMCCA Order, No. 99–0195 (N.M.Ct.Crim. App. 5 Feb. 1999). Second, Appellant moved for

Summary Reversal of his convictions based on the decision in *United States v. Davis*, 50 M.J. 426 (1999). We denied Appellant's requested relief. *United States v. Schnable*, NMCCA Order, No. 99–0852 (N.M.Ct.Crim.App. 30 Mar. 2000).

*ing,* 41 M.J. 213, 291 (1994); *United States v. Smith,* 27 M.J. 242, 248 (C.M.A.1988) (citing *Ex Parte Quirin,* 317 U.S. 1, 40, 63 S.Ct. 1, 2, 87 L.Ed. 3 (1942)); *United States v. Santiago–Davila,* 26 M.J. 380, 389 (C.M.A.1988).

We are unpersuaded that the military judge did anything other than properly exercise his discretion when he limited Appellant's *voir dire* of the members. *See United States v. Belflower,* 50 M.J. 306, 307, 309 (1999); R.C.M. 912(d), Discussion. On the facts presented, he merely took the steps necessary to exercise appropriate and efficacious "control over the proceedings." R.C.M. 801(a)(3).

Despite the strident allegations contained in Appellant's brief, we are fully confident, based on our independent review of the record, that the military judge maintained an impartial attitude with respect to these proceedings. He made appropriate evidentiary and other rulings and reigned in counsel on both sides as necessary. When he examined witnesses, it was usually done to meet his responsibility to pose questions from members of the court-martial. We find that when the military judge posed questions on his own, it was merely to clarify testimony and to impartially develop relevant and helpful facts, not to promote a prosecutorial agenda.

In his final *Grostefon* assignment of error, Appellant contends that the military judge denied him adequate time to prepare a case in sentencing. We disagree.

Appellant and his counsel had several months to prepare a sentencing case, including "letters from [Appellant's] family." Record at 830. Following the guilty findings, the military judge offered Appellant as much as "an hour" to finalize his sentencing case. *Id.* at 831. In response, Appellant's civilian defense counsel only requested "a half hour" to do so. *Id.* In fact, the sentencing phase proceeded without any further expression of concern after a 40–minute recess. *Id.* at 833. Moreover, Appellant was apparently able to obtain the exhibits he wanted to submit during the recess. *See id.* at 835; Defense Exhibits O, P, and Q. All were admitted into evidence. Record at 836.

## XIII. Supplemental Assignments of Error

This Court granted Appellant's motion to file two additional assignments of error out of time. Both are based on an allegation, raised for the first time over 3 years after the trial adjourned, that, in spite of what it says in the authenticated record of trial, the military judge erroneously instructed the members not to discuss the case with defense counsel. After a careful reading of all that both sides have submitted on these two issues, we see no basis to grant relief.

The trial counsel reviewed and the military judge authenticated the record of trial less than a month after this court-martial adjourned. Record at 859. According to the signature of the supervisory court reporter, a copy of this record was made available for examination by the defense on 5 March 1999. *Id.* In every respect, the record appears to be what it purports to be, a verbatim transcription of the general court-martial proceeding in Appellant's case.

In a "declaration" attached to his motion, Appellant's civilian defense counsel, who represented Appellant at trial and continues to do so on appeal, states that he and the military defense counsel "looked at each other incredulously" when the military judge provided the members with their final instructions. Motion for Leave to File Supplemental Assignment of Error of 25 July 2002 at 2, ¶ 3. However, neither counsel raised the issue on the record or at any subsequent point for a period of 3 years. Yet Appellant and his civilian defense counsel now contend that he is somehow entitled to dismissal of the charges.

Before dismissing the members and based on the authenticated record of trial, the military judge instructed the members as follows:

> You took an oath at the beginning not to disclose your vote or opinion or that of any other member, and you're held to that vote. So you cannot disclose your vote or opinion, or that of any other member. You

659

can, however, if you want, discuss other aspects of this case, as long as it isn't your vote or opinion, or that of any other member. You can choose not to discuss this with anyone. That's certainly your right. But if you do discuss it with anyone, those are the limits, your—not your vote or opinion, and not that of any member.

Record at 857. This instruction was in accordance with Mil. R. Evid. 606(b), requiring the deliberations of the members remain confidential. "[I]mproper invasion into the court members' deliberations [goes] to the very heart of the trial process ...." *United States v. Brooks*, 42 M.J. 484, 487 (1995). "The purpose of this rule is to protect 'freedom of deliberation,' protect 'the stability and finality of verdicts,' and protect court members 'from annoyance and embarrassment.'" *Loving*, 41 M.J. at 236 (quoting *United States v. Bishop*, 11 M.J. 7, 9 (C.M.A. 1981)). Thus, the military judge's concluding instruction to the members prior to dismissing them was proper.[7]

Additionally, pursuant to Article 54(a), UCMJ, 10 U.S.C. § 854(a), the military judge authenticated the record of trial. "Before authentication by the military judge, a copy of this record was made for examination by the defense." Record at 859. "The record should reflect that the defense counsel was given such an opportunity or why not." *United States v. Munoz*, 54 M.J. 917, 918 (A.F.Ct.Crim.App.2001); *see* R.C.M. 1103(i)(1)(B). Defense counsel was also served with the authenticated record of trial by mail on 19 March 1999. Recommendation of the Staff Judge Advocate of 26 Mar 1999 at 3. "Substantial matters were then submitted by the appellant through his counsel. No objection to the contents of the record was made." *Munoz*, 54 M.J. at 918; *see also* Art. 38(c), UCMJ, 10 U.S.C. § 838(c); Petition for Clemency of 22 Apr 1999; R.C.M. 1104(d). We conclude that the Appellant forfeited any objection to the contents of the authenticated record of trial.

Indeed, we are quite comfortable with the presumption that the record of trial properly reflected what actually took place. Appellant does not point to any irregularity in the record to rebut that presumption. The record of trial was properly authenticated. We see no basis to question its accuracy.

Even assuming *arguendo* that the military judge did instruct the members not to discuss their verdict with either counsel, Appellant would still not be entitled to relief. That would have been a proper instruction. An appellant does not have a right to question members "concerning their conduct during the proceedings and deliberations." *United States v. Lambert*, 55 M.J. 293, 296 (2001); *see* R.C.M. 1007(c)(as a general rule, "members may not ... be questioned about their deliberations and voting."). As this Court has observed:

We are aware that military justice sections, the Navy–Marine Corps Trial Judiciary, and the Judge Advocate General of the Navy may advocate use of post-trial surveys of members as a training tool for trial advocates. We are concerned that such inquiries, though well-meaning, may inadvertently improperly invade the deliberative process of the court-martial. Where such surveys are conducted, they should be carefully limited to objective matters which relate to trial advocacy. Inquiries into the members' subjective perceptions of the evidence risk creating appellate issues unnecessarily.

*United States v. Ovando–Moran*, 44 M.J. 753, 756 n. 2 (N.M.Ct.Crim.App.1996). Only after a showing of a proper ground to impeach the verdict may an inquiry be conducted. *Lambert*, 55 M.J. at 295. The trial court has wide discretion in determining whether to investigate the members regarding their verdict and what kind of investigation to make. *Id.* Here, Appellant does not allege any proper grounds pursuant to Mil. R. Evid. 606(b) to impeach the members verdict. He simply feels he has a right to question them to see if such a ground exists. To allow any

7. We note that the military judge's instruction comported with both the Military Judges' Benchbook, Dept. of the Army Pamphlet 27–9 (30 Sep 1996) at 106, and the Trial Guide, U.S. Navy–Marine Corps Trial Judiciary (Jan 1996) at 104–05.

appellant such unfettered access to the members' verdict would serve to invade the freedom of deliberation, undermine the stability and finality of verdicts, and subject the members to annoyance and embarrassment.

For all these reasons, therefore, we conclude that Appellant's two supplemental assignments of error are without merit.

## XIV.  Conclusion

Accordingly, we affirm the findings and sentence, as approved on review below.

Judge VILLEMEZ and Judge HARRIS concur.